**Slip Op. 04-32**

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————

TUNG FONG INDUSTRIAL CO., INC.,

                       *Plaintiff,*

           v.

UNITED STATES,

                       *Defendant.*

———————————————————————

: : : : : : : : : : :

Court No. 01-00070

[U.S. Department of Commerce's antidumping duty determination is remanded for action consistent with this opinion.]

Decided: April 7, 2004

Miller & Chevalier Chartered (Peter J. Koenig), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; William G. Iasi, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

This action contests the final affirmative antidumping determination of the U.S. Department of Commerce, imposing substantial duties on certain stainless steel butt-weld pipe fittings ("fittings") produced in the Philippines and exported to the United States by companies including plaintiff Tung Fong Industrial Company, Inc. ("Tung Fong"), a small, family-owned manufacturer of such fittings. *See* Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel

Butt-Weld Pipe Fittings From the Philippines, 65 Fed. Reg. 81,823 (Dec. 27, 2000) ("Final Determination"), adopting the Issues and Decision Memo (Dec. 27, 2000), Pub. Doc. 141 ("Decision Memo").

Jurisdiction is predicated on 28 U.S.C. § 1581(c) (1994).[1]   In a matter such as this, the Commerce Department's findings, conclusions and determinations must be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B) (1994).

Pending before the Court is Plaintiff's Motion for Judgment on the Agency Record, in which Tung Fong urges the revocation of the antidumping duty order associated with the determination at issue here, because the petition that ultimately led to that determination falsely alleged that Tung Fong had "home market" sales of the relevant merchandise.  See Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Agency Record ("Pl.'s Brief") at 1-4; Plaintiff's Reply to [the Department of Commerce's] Opposition Memorandum ("Pl.'s Reply Brief") at 2-3.

In the alternative, Tung Fong challenges both the Commerce Department's decision to resort to the use of "adverse facts available" in calculating the company's dumping margin, and the particular adverse facts selected by the agency for use in those calculations.  See Pl.'s Brief at 4-6; Pl.'s Reply Brief at 4-8.  And, finally, Tung Fong disputes the Commerce Department's "all others" rate, charging that it impermissibly includes dumping margins based on "adverse facts available."  See Pl.'s Brief at 6-7; Pl.'s Reply Brief at 8.

---

[1]Except as otherwise expressly noted, statutory citations in this opinion are to the 1994 version of the U.S. Code.  However, the pertinent text of the cited provisions remained the same at all times relevant herein.

Plaintiff's motion is opposed by defendant, the United States ("the Government"), which maintains that the determination at issue should be sustained in all respects. *See* Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Def.'s Brief") at 1, 12-13, 35.

Plaintiff's motion is granted in part. For the reasons discussed below, this action is remanded to the Department of Commerce to enable it to reconsider the adequacy of the underlying antidumping duty petition, and the consequences of the falsity of the petition's allegations of home market sales by Tung Fong; to allow the Department to reconsider its decision to resort to adverse facts available in calculating Tung Fong's antidumping duty margin (and, if appropriate, to reevaluate the particular adverse facts selected); and to accord the agency the opportunity to fully articulate the reasoning underlying its findings, conclusions and determinations.

## I. **Background**

### A. The Legal Framework

Dumping occurs when goods are imported into the U.S. and sold at a price lower than their "normal value." 19 U.S.C. §§ 1673, 1677(34). Normal value is calculated using either the exporting market price (i.e., the price in the "home market" where the goods are produced), or an appropriate third country market price, or the cost of production of the goods. 19 U.S.C. § 1677b. The difference between the normal value of the goods and the U.S. price is the "dumping margin." 19 U.S.C. § 1677(35). When goods imported into the U.S. are determined to have been dumped, antidumping duties equal to the dumping margin may be imposed against the goods. 19 U.S.C. § 1673(2)(B).

When normal value is based on sales of goods that are physically similar – but not identical – to the goods sold in the U.S., adjustments may be made to normal value to account for the differences in the goods' costs of production. 19 U.S.C. §§ 1677(16) (B)-(C), 1677b(6)(C)(ii); 19 C.F.R. § 351.411. Those difference in merchandise ("difmer") adjustments are calculated based on the differences in the costs of materials, labor, and variable factory overhead attributable to the physical differences in the goods. Antidumping Manual, Chap. 8 at 49-50 (Dept. of Comm., Jan. 22, 1998) ("AD Manual").

A U.S. industry claiming injury due to dumping may petition the Department of Commerce for an antidumping investigation into the alleged dumping. 19 U.S.C. § 1673a(b). The petition must allege both dumping and injury to the industry as a result of that dumping, and must also include "information reasonably available to the petitioner" supporting those allegations. 19 U.S.C. §§ 1673, 1673a(b)(1). In addition, to the extent that it is reasonably available, the petition must include factual information (i.e., documentary evidence) relevant to, for example, the calculation of the normal value of the allegedly dumped goods. 19 C.F.R. § 351.202(b)(7)(i)(B).

When an antidumping petition is filed with the Commerce Department, the agency must verify that the petition includes the requisite allegations of dumping and injury. 19 U.S.C. § 1673a(c). Further, on the basis of sources readily available to it, the agency must confirm "the accuracy and adequacy of the evidence provided in the petition." 19 U.S.C. § 1673a(c)(1)(A)(i); 19 C.F.R. § 351.203(B)(1). If the Commerce Department determines that the petition fulfills all statutory and regulatory requirements, an antidumping investigation is initiated. 19 U.S.C. §§ 1673a(b)(1), 1673a(c)(1)(A)(i).

Generally, all known exporters and producers of the goods at issue are investigated individually, and are therefore assigned individual dumping margins, unless it would be impracticable to do so. 19 U.S.C. § U.S.C. 1677f-1(c); 19 C.F.R. § 351.204(c)(1). Where it would be impracticable for the Commerce Department to individually investigate all known exporters and producers, a subset of the exporters and producers may be selected for individual investigation. 19 U.S.C. § 1677f-1(c)(2); 19 C.F.R. § 351.204(c)(2). Exporters and producers that are not individually investigated are assigned an estimated "all others" rate. AD Manual, Chap. 6 at 10. The "all others" rate is a dumping margin equal to the weighted average of the dumping margins established for the exporters and producers that are individually investigated (with certain exceptions not relevant here). 19 U.S.C. § 1673d(c)(5)(A).

Exporters and producers that are selected to be investigated individually are considered "mandatory respondents." AD Manual, Chap. 4 at 14-15. Exporters and producers that are not selected as mandatory respondents may request to be designated "voluntary respondents." AD Manual, Chap. 4 at 14-15. Unless it would be "unduly burdensome" for the Commerce Department, exporters and producers that request treatment as voluntary respondents are investigated individually. 19 U.S.C. § 1677m(a); 19 C.F.R. § 351.204(d)(2). However, voluntary respondents must submit the same information required from mandatory respondents, on the same timetable. 19 U.S.C. § 1677m(a); 19 C.F.R. § 351.204(d)(2).

An antidumping questionnaire is issued to all mandatory respondents, as well as to those exporters and producers requesting treatment as voluntary respondents. AD Manual, Chap. 4 at 14-15. Generally, the antidumping questionnaire consists of five sections, numbered A through E, plus

several appendixes.  AD Manual, Chap. 4 at 2-8.  Section A requires respondents to submit general

information about their corporate structure and business practices, as well as information concerning

the allegedly dumped goods.  AD Manual, Chap. 4 at 2.  Section B requires respondents to list sales

transactions of the goods in the appropriate foreign market (either the exporting "home country"

market or the third country market), in order to determine the normal value of the goods.  AD

Manual, Chap. 4 at 3.  Section C requires respondents to list U.S. sales transactions, for use  in

determining the U.S. price against which normal value is compared.  AD Manual, Chap. 4 at 6.

Section D, which is not required in all investigations, solicits information on the costs of producing

the goods under investigation.  AD Manual, Chap. 6 at 6-7.  Section E, also not required in every

investigation, seeks information about value added in the U.S. to the goods, prior to delivery to

unaffiliated U.S. customers.  AD Manual, Chap. 4 at 7.

The antidumping questionnaire is designed to elicit all information necessary to determine

whether a respondent is dumping and, if so, to calculate the dumping margin.  AD Manual, Chap.

6 at 11.  However, where the Commerce Department is unable to obtain all of the necessary

information from a respondent,  the agency may use "facts available" as a substitute.  19 U.S.C. §

1677e(a); 19 C.F.R. § 351.308.   Thus, for example, the Commerce Department may use facts

available where a respondent withholds information or fails to provide it on time or in the form

requested, or where the information provided by the respondent cannot be verified.  19 U.S.C. §

1677e(a)(2); 19 C.F.R. § 351.308(a).  The agency may use as "facts available" any acceptable

information it can find to substitute for the missing information.  AD Manual, Chap. 6 at 11.

Moreover, where a respondent affirmatively "fail[s] to cooperate by not acting to the best of its ability" in responding to the agency's requests for information, the Commerce Department may resort to "adverse facts available," by applying an inference that is adverse to that respondent in selecting among the "facts available." 19 U.S.C. § 1677e(b); 19 C.F.R. § 351.308(a). *See also* AD Manual, Chap. 6 at 14-16. Where it is warranted, the Commerce Department may use "facts available" or "adverse facts available" as a substitute for all or part of the information required to calculate a respondent's dumping margin. *See* 19 U.S.C. § 1677e; 19 C.F.R. § 351.308.

## B. The Facts of This Case

The antidumping investigation here at issue was initiated based on a petition filed with the Commerce Department and the International Trade Commission by a group of fitting manufacturers in the United States ("Domestic Manufacturers"). *See* Initiation of Antidumping Duty Investigation: Stainless Steel Butt-Weld Pipe Fittings from Germany, Italy, Malaysia and the Philippines, 65 Fed. Reg. 4595 (Jan. 31, 2000). The petition alleged, in relevant part, that two Philippine producers – Enlin Steel Corporation ("Enlin") and Tung Fong – were selling fittings under 14 inches in diameter[2] in the U.S. at less than their home market prices. Pub. Doc. 1 at 7.[3] The petition further indicated

---

[2]Stainless steel butt-weld pipe fittings are manufactured in a variety of shapes including elbows, tees, reducers, stub-ends and caps. They are widely used in piping systems in, for example, chemical plants, refineries, pharmaceutical plants, food processing facilities and waste treatment facilities. *See* Antidumping Duty Petition: Certain Stainless Steel Butt-Weld Pipe Fittings From Germany, Italy, Malaysia and the Philippines (Dec. 29, 1999), Pub. Doc. 1 at 11, 37.

[3]The administrative record in this case consists of two sections, designated "Public" and "Business Proprietary," respectively. The "Public" section consists of copies of all documents in the record of this action, with all confidential information redacted. The "Business Proprietary" section

that Tung Fong and Enlin account for 100 percent of exports of the subject fittings from the Philippines to the United States.  Pub. Doc. 1 at 34-35.

### 1.  The Domestic Manufacturers' Antidumping Petition

The allegations in the Domestic Manufacturers' petition were based largely on a confidential market research report commissioned by, and funded by, the Domestic Manufacturers.  The report purported to provide "prices for actual recent sales by [Tung Fong and Enlin] to unaffiliated end users in the Philippines."  Pub. Doc. 1 at 34.  Relying on the asserted "home market" price data in that report, and comparing it to data on U.S. sales by Enlin and Tung Fong, the Domestic Manufacturers estimated dumping margins ranging from 26.1% to 68.5%.  Pub. Doc. 1 at 37.

Upon receipt of the Domestic Manufacturers' petition, the Commerce Department reviewed it – as required by statute – to evaluate, *inter alia*, the accuracy and adequacy of the evidence provided by the Domestic Manufacturers. 19 U.S.C. § 1673a(c)(1)(A)(i).  In a January 12, 2000 teleconference conducted as part of its review process, the Domestic Manufacturers' market researcher represented to Commerce Department personnel that he had obtained "home market" sales information from specified highly reliable sources.  Non-Pub. Doc. 7.

Based on the petition and on the assurances provided in its teleconference with the Domestic Manufacturers' market researcher, the Commerce Department concluded that the evidence provided

consists of complete, unredacted copies of only those documents that include confidential information.

Citations to documents in the "Public" section of the administrative record are noted as "Pub. Doc. ____."  Citations to documents in the "Business Proprietary" section are noted as "Non-Pub. Doc. ____."  All page numbers refer to the original, internal pagination of the documents.

by the Domestic Manufacturers was "sufficient to justify the initiation of [an] antidumping investigation[ ]." Pub. Doc. 13 at 13-14. However, as the Commerce Department would soon learn, neither Enlin nor Tung Fong actually had home market sales. The allegations of the Domestic Manufacturers and their market researcher were false. And the Domestic Manufacturers' petition alleged no grounds other than "home market" sales to justify an antidumping investigation.

### 2. The Commerce Department's Antidumping Questionnaires

As soon as the antidumping investigation was initiated, the Commerce Department sent Enlin and Tung Fong section A of its antidumping duty questionnaire, seeking information regarding the companies' corporate structure and accounting practices, and general information regarding sales of the goods under investigation. Pub. Docs. 17, 18. The agency required Enlin and Tung Fong to submit their responses to Question 1 – regarding sales in the U.S., the home market, and third country markets – by February 7, 2000, with the remainder of section A due one week later.

Enlin and Tung Fong returned timely responses to Question 1, each attesting – under oath – that it had no home market sales of the merchandise at issue. Pub. Docs. 25, 26. Explaining that it is a "very small company, with limited resources and staff, [who were] basically answering [the] questions themselves," Tung Fong sought – and was granted – a two-week extension of time to file its responses to the remainder of section A of the questionnaire. Pub. Doc. 29 at 2; Pub. Doc. 31. Indeed, Tung Fong emphasized that it was "by far" the smallest of all the respondents – not only in the Philippines, but in the three other countries under investigation as well.[4] *Id.* Enlin sought and

---

[4]Although only Enlin and Tung Fong manufacture in the Philippines, the Commerce Department was investigating 16 other fittings manufacturers in Germany, Italy, and Malaysia. *See*

was granted the same extension of time to file the remainder of its response to section A of the questionnaire. Pub. Docs. 30, 32.

As Tung Fong explained to the Commerce Department, the company "has no authority to sell fittings in the home market – i.e., [it] is prohibited from doing so," because of its status as an *export* producer operating within a Philippine economic zone. Pub. Doc. 53 at 32. That status permits the company to purchase raw materials duty-free, provided that its products are manufactured for export only. Pub. Doc. 124 at 5.

Enlin and Tung Fong submitted their responses to the remainder of section A of the questionnaire on February 22, 2000. Pub. Docs. 36, 38. Tung Fong responded in detail to each question posed by the Commerce Department, consistently reiterating – where appropriate – the fact of its lack of "home market" sales. Pub. Doc. 38 at 5.

Less than a week later, over the objections of Tung Fong, the Commerce Department selected Enlin as the sole mandatory respondent for the Philippine investigation. The Commerce Department asserted that, given its limited resources, it "would be able to investigate only one such company." The agency chose Enlin as the mandatory respondent "because it was the respondent with the greatest export volume."[5] *See* Notice of Preliminary Determination of Sales at Less than Fair Value: Stainless Steel Butt-Weld Pipe Fittings From the Philippines, 65 Fed. Reg. 47,393, 47,394 (Aug. 2,

_____

Stainless Steel Butt-Weld Pipe Fittings From Germany, Italy, Malaysia and the Philippines, 65 Fed. Reg. at 4597.

[5]The Commerce Department's Preliminary Determination refers to the agency's "Respondent Selection Memorandum," dated March 1, 2000. Preliminary Determination, 65 Fed. Reg. at 47,394. That document appears to be missing from the administrative record filed with the Court.

2000) ("Preliminary Determination") (further asserting that, given the "complexities expected to arise" in the investigation, it "was not practicable . . . to examine all known producers/exporters of the subject merchandise"). Tung Fong protested that it "wishe[d] to fully participate in [the] investigation, answering [Commerce's] questionnaires . . . ." Pub. Doc. 41.

On March 9, 2000, the Commerce Department issued to Enlin additional sections of the agency's antidumping duty questionnaire. Pub. Doc. 43. After seeking and being granted an extension of time, Enlin responded on May 1, 2000. Although the Commerce Department had denied it consideration as a mandatory respondent, Tung Fong also responded to sections B and C of the questionnaire on the same schedule, "pursuant to [the Commerce Department's] Respondent Selection Memorandum as to voluntary respondents, in the hope that [the agency] [would] be able to consider it[s] [response]." Pub. Doc. 51.

The Commerce Department did not respond to Tung Fong's submissions and, instead, continued to focus its investigation solely on Enlin. In early June 2000, the agency began investigating Enlin's costs of production, to account for differences between the company's merchandise sold in the U.S. and its third country sales. The Commerce Department therefore requested that Enlin respond to section D of the agency's questionnaire. *See* Preliminary Determination, 65 Fed. Reg. at 47,394. On June 22, when its section D questionnaire responses were already nearly a week overdue, Enlin informed the Commerce Department that it would not respond to any further agency requests for information. Pub. Doc. 74.

Only then did the Commerce Department decide to investigate Tung Fong as a voluntary respondent. Tung Fong responded to section D of the agency's questionnaire, which required the

company to supply extensive data on its production costs. Non-Pub. Doc. 68. Tung Fong's responses to section D – filed on July 5, 2000 – explained that the company did not have an established "formal cost accounting system" to allocate costs between its many different products. *Id.* at 10. Thus, for purposes of responding to the section D questionnaire, Tung Fong was required to develop – for the first time – a methodology to allocate its raw material, labor, and overhead costs for each type of fitting subject to the investigation.

In an attempt to allocate its costs of production, Tung Fong first "group[ed] its total production into thirteen categories of fitting subgroups," based on its analysis of which products pass through which production processes. Non-Pub. Doc. 68 at 16. Tung Fong then allocated raw material and labor costs among the 13 individual categories on the basis of the weight of the fittings, reasoning that material and labor costs increase as the weight of the fittings increase. *Id.* at 17; Pub. Doc. 105 at 47 However, in contrast to the weight-based methodology it used to allocate material and labor costs, Tung Fong treated the depreciation of factory machinery differently, indicating that it was "allocat[ing] depreciation per category based on the share of *machine time* used by each production stage." Non-Pub. Doc. 68 at 17 (emphasis added). Significantly, this usage of the phrase "machine time" proved to be the source of much confusion on the part of the Commerce Department, which was not fully resolved until the agency conducted its verification some months later.

In mid-July 2000, the Commerce Department sent Tung Fong a supplemental questionnaire, following up on the company's earlier responses to sections A through D (some of which had been submitted to the agency as early as February 2000). Pub. Doc. 86. Among other things, the agency's 21-page supplemental questionnaire probed the allocation of costs using product weight versus

machine times. Specifically, the Commerce Department asked Tung Fong to "explain why machine times cannot be used to allocate costs to each product rather than weight; provide a schedule that identifies the machine times used to allocate costs to each product group; explain how these machine times are determined and provide a sample copy of the source document used to determine these times; and, clarify how the machine times have been used to allocate costs in the response." Pub. Doc. 86 at 18-19.

In the meantime, the Commerce Department's affirmative Preliminary Determination issued on August 2, 2000. Because the agency had not begun to investigate Tung Fong's costs of production until late in the process, it was unable to make a preliminary calculation of a company-specific dumping margin. Instead, the agency assigned Tung Fong the non-adverse "all others" rate – consisting of the simple average of the margins proposed in the petition (34.67%). Preliminary Determination, 65 Fed. Reg. at 47,395-96.

Some of Tung Fong's responses to the Commerce Department's supplemental questionnaire were filed within the amount of time initially specified by the agency. Tung Fong sought, and was granted, additional time to respond to other supplemental questions, including the questions concerning its cost allocation methodology. Pub. Docs. 93, 94. On that point, Tung Fong's supplemental questionnaire responses explained that the company did not have "machine times" for the huge number of fittings that it produces, and that it simply was not feasible to generate such machine times within the time constraints of the agency's investigation:

> Tung Fong is a very small company and does not maintain machine times on all items it produces. To maintain machine times for over [700] different types of fittings alone . . . is . . . an impossible task for Tung Fong. There is also a certain level of difficulty in maintaining machine times as Tung Fong employees often

> perform above par when their performances are being monitored . . . . Tung Fong does not have the resources to specially conduct a measurement of machine time in order to provide a machine timetable for this response as this would entail the special manufacture of [more than 700] different types of fittings.

Pub. Doc. 109 at 4.

Notwithstanding Tung Fong's explanation of the impracticability of determining "machine times" for its wide range of products, the Commerce Department sent the company a second supplemental section D questionnaire dated September 1, 2000, directing Tung Fong to report its costs of production using a "machine time" based method of allocation. *See* Pub. Doc. 113. Tung Fong's response to that second supplemental questionnaire clarified that, in fact, "machine times *were not* used to allocate costs" – even for the depreciation of machinery. Pub. Doc. 117 at 6 (emphasis added). The reference to "machine times" in the company's initial section D questionnaire responses was actually shorthand for "machine time *factors*" derived from depreciation expenses. Pub. Doc. 24 at 21. Indeed, Tung Fong explained that – although it had experimented with machine times – it ultimately rejected their use, because it discovered that they led to grossly disproportionate allocations of costs (actually erring in Tung Fong's favor, by allocating *too few* costs to the fittings under investigation, thus giving Tung Fong an "unfair advantage"). Pub. Doc. 117 at 6-7.

### 3. The Agency's Verification Process

From September 25 through September 29, 2000, Commerce Department personnel conducted a verification of Tung Fong's cost of production and constructed value data, visiting the company's facility in the Philippines. In the course of the verification process, agency personnel

confirmed that Tung Fong had no pre-existing cost accounting system that could be used to allocate costs among its many products, and thus had been forced to develop such a system for the investigation. Verification Report, Pub. Doc. 124 at 8. Commerce Department personnel further confirmed that Tung Fong "had experimented with various allocation methods . . . not all of [which] were used." *Id*. at 20.

In particular, the Commerce Department personnel conducting the verification noted that Tung Fong had initially attempted to allocate certain depreciation expenses by using so-called "machine time *factors*." But the agency personnel quickly discovered that they had misunderstood the nature of those "machine time factors." The "machine time *factors*" that Tung Fong had tried to use were not, in reality, actual "machine times" as the agency generally understands the term. Indeed, the agency personnel conducting the verification confirmed that Tung Fong in fact "does not track machine times." *Id*. at 20-21. The "machine time *factors*" that the company had initially sought to use to allocate depreciation expense thus were not "machine times" at all but, rather, reflected "each production process' proportional share of total depreciation expense of the specific machines used in the process." *Id.* In any event, as agency personnel reported, Tung Fong had ultimately rejected the use of "machine time factors" as inaccurate – that is, they "incorrectly distributed too much depreciation to product groups made up of low-volume lightweight fittings," because higher volume (higher weight) products typically cost more to produce. *Id*. at 20-21.

Significantly, the Commerce Department's verification personnel did not dispute Tung Fong's assessment that there were inherent inaccuracies in the use of "machine time *factors*," as the agency personnel now understood them. Indeed, the agency's verification personnel expressly

conceded that – while the company's experimentation with "machine time *factors*" evidenced its realization "that each [item under investigation] should not be assigned the same per-unit depreciation cost" – the "machine time *factors*" methodology in particular "may *or may not* have calculated reasonable costs." *Id*. (emphasis added).

The Commerce Department's verification personnel also reviewed Tung Fong's attempt to allocate per-unit direct labor costs for certain "time-driven" production processes by using "machine time *estimates*." The agency personnel found that, since Tung Fong does not track actual "machine times," the company had asked employees assigned to the specified processes "to *estimate* how much time they spend on each fitting." *Id*. (emphasis added). However, as agency personnel reported, that cost allocation method was eventually rejected because, *inter alia*, it was unrealistic – that is, "the time estimates provided by the employees would produce [a] production volume that exceeded the actual capabilities of the machines." *Id*.[6]

Significantly, the Commerce Department verification personnel did not dispute Tung Fong's conclusion that its employees' "time estimates" were inaccurate. Thus, when the agency personnel "compared the [discredited time *estimates* for select products] to those [times] reported in the cost file [which had been generated using Tung Fong's weight-based method of allocating costs]," it should have been no surprise to anyone "that the results generated by Tung Fong's weight and time-based methods did not mirror each other" – precisely because the "time-based method[ ]" to which the agency referred was based on the "time estimates" that had already been disavowed. *Id*. at 21.

---

[6]As the Commerce Department personnel noted, there would be at least one additional problem with a cost allocation methodology relying on "time estimates" – its "fail[ure] to account for the production of non-subject merchandise and caps." *Id*.

But, instead, the Commerce Department verification personnel inexplicably seized on the discrepancy as an indictment of Tung Fong's weight-based methodology, emphasizing that the company had earlier advised the Department "that the [company's] weight-based method should provide similar results as a time-based approach." Verification Report, Pub. Doc. 124 at 21. The agency personnel apparently misunderstood the point that Tung Fong had sought to make – that, since heavier fittings generally take longer to process, the relative weights of various fittings should be a rough proxy for time in allocating costs among the company's products. In other words, Tung Fong's point was that its "weight-based method should provide similar results as [*an accurate*] time-based approach" – not just *any* time-based approach (and certainly not an approach based on employees' "time estimates," which the company had first explored and then rejected as inaccurate).

The Commerce Department verification personnel offered no justification or other explanation for their reliance on already discredited "machine time *estimate*" data as a basis for attempting to discredit other data. Nor did they offer any explanation as to why – even if the machine time estimate data *had not* been discredited – a discrepancy between those data and Tung Fong's "weight-based" data would necessarily mean that the machine time estimate data were more reliable.

### 4.  The Commerce Department's Final Determination

The Commerce Department's affirmative Final Determination assigned Tung Fong a dumping margin of 33.81 % – the highest margin calculated for any company in all the countries

investigated, and the same margin assigned to Enlin Steel and to "All Others." *See* Final Determination, 65 Fed. Reg. at 81,825; Antidumping Duty Orders: Stainless Steel Butt-Weld Pipe Fittings From Italy, Malaysia, and the Philippines, 66 Fed. Reg. 11,257, 11,258 (Feb. 23, 2001), Pub. Doc. 153.

In calculating Tung Fong's dumping margin, the Commerce Department used the company's sales data where fittings sold in the U.S. had identical matches in the third country. However, the Department rejected the weight-based data proffered by Tung Fong for the agency's use in making "differences in merchandise" – "difmer" – adjustments where there were no such identical matches. Deeming Tung Fong's weight-based data inaccurate, and asserting that the "time-based allocation method" that the company had abandoned "provided per-unit costs at a greater level of detail than the [company's] reported [weight-based] method because it relied on each model's unique process and production time," the Commerce Department concluded that Tung Fong had withheld relevant information requested by the agency. Accordingly, the Department resorted to "facts available" for all non-identical price-to-price comparisons. Decision Memo at 7, Pub. Doc. 141 at 7.

Indeed, the Commerce Department not only resorted to "facts available," it used "adverse facts available" against Tung Fong. Specifically, the agency concluded that – because Tung Fong did not allocate costs using a "time-based allocation method" – the company "failed to cooperate [in the investigation] by not acting to the best of its ability." *Id*. at 8. The agency further asserted that the company "fail[ed] to perform due diligence on its assertions," reasoning that "[h]ad Tung Fong performed a simple comparison of its submitted costs developed using time-based [cost allocations], it would have found that the two methods do not calculate similar results, as [agency personnel]

found at verification." *Id*. The Commerce Department maintained that Tung Fong had the information necessary to generate the type of time-based cost allocation data requested by the agency, and that the verification personnel had demonstrated that the calculations could be performed with the information supplied by the company. *Id.* at 8.

In addition, the Commerce Department found that Tung Fong "hindered the proceeding by providing untimely responses," noting that the agency granted the company "several extensions on its already extended deadlines for responding to questionnaires." The agency concluded that Tung Fong should "easily have been able to calculate the necessary [time-based cost] allocations within the extended time allotted." *Id*.

Based on its determination that Tung Fong had "failed to cooperate by not acting to the best of its ability" to comply with the agency's requests for information, the Commerce Department applied an adverse inference in selecting the "facts available" used to calculate Tung Fong's dumping margin. Thus, for all non-identical price-to-price comparisons, the agency used the highest margin found for any U.S. sale whose margin was calculated from an identically matched price-to-price comparison. *Id*.

Tung Fong filed a timely appeal, and this litigation ensued.

## II. **Analysis**

### A. The Sufficiency of the Domestic Manufacturers' Petition

As a threshold matter, Tung Fong attacks the adequacy of the Domestic Manufacturers' antidumping petition, asserting that it was insufficient to justify the initiation of the investigation at issue here. Pl.'s Brief at 1. In particular, Tung Fong argues that an antidumping petition must

include evidence of dumping, and that the Domestic Manufacturers' petition failed to meet that burden because it was based on the false premise that Tung Fong had home market sales. *Id.* at 1-4.

In support of its argument, Tung Fong points to the statute, which provides, in relevant part, that "[a]n antidumping proceeding shall be initiated whenever an interested party . . . files a petition with [the Commerce Department] which alleges the elements necessary . . . and which is accompanied by information reasonably available to the petitioner supporting those allegations." Pl.'s Brief at 1-2 (*quoting* 19 U.S.C. § 1673a (b)(1) ). Tung Fong notes that Commerce Department regulations require that the agency "determine that the petition satisfies the relevant statutory requirements before initiating an antidumping . . . investigation." 19 C.F.R. § 351.203(a); Pl.'s Brief at 2. Tung Fong further emphasizes that the regulations require that an antidumping petition include:

> [a]ll factual information (*particularly documentary evidence*) relevant to the calculation of . . . the normal value of the foreign like product (if unable to furnish information on foreign sales or costs, provide information on production costs in the United States, adjusted to reflect production costs in the country of production of the subject merchandise).

Pl.'s Brief at 2; 19 C.F.R. § 351.202(b)(7)(i)(B) (emphasis added)

Tung Fong bolsters its argument with references to the United States' international obligations, which require that antidumping petitions contain "*evidence* of . . . dumping," and which specify that "[s]imple assertion, *unsubstantiated by relevant evidence*, cannot be considered sufficient . . . " to warrant the initiation of an investigation. Pl.'s Brief at 2 (emphasis added) (*citing* Agreement on Implementation of Article VI of the GATT 1994, Part 1, Articles 5.2 and 5.3).

The United States' international obligations are reflected in the history of the Commerce Department's regulations implementing the Uruguay Round Agreements Act, which had as its purpose bringing this country into conformity with its WTO obligations. There, the Commerce Department expressly rejected the notion that "the mere provision of *any* documentation [by a domestic industry] is . . . necessarily sufficient" (emphasis in the original), and emphasized the agency's "statutory obligation to examine the *accuracy and adequacy* of the evidence provided in [a] petition" to determine whether initiation of an investigation is warranted. Final Rule: Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,307 (May 19, 1997) (emphasis added).

In an effort to minimize its "statutory obligation to examine the accuracy and adequacy of the evidence" set forth in a petition, the Government asserts that the Commerce Department may decline to initiate an investigation only where the investigation would be "clearly frivolous" or where the petitioner has failed to provide information reasonably available to it. *See* Def.'s Brief at 14-15. The Government further asserts that, once an investigation is launched, the process marches inexorably on – absent an intervening negative determination by either the Commerce Department or the International Trade Commission – until a final affirmative determination is made and an antidumping duty order is issued. Def.'s Brief at 15-16.

It is true that Commerce Department personnel in this case telephoned the Domestic Manufacturers' market research firm on January 12, 2000 to verify, *inter alia*, the statements concerning Tung Fong's alleged home market sales. Pub. Doc. 12. But the fact remains – undisputed by the Government – that, contrary to the Domestic Manufacturers' claims and without

regard to any assurances given by the Domestic Manufacturers' market research firm in the course of the January 12, 2000 telephone call, Tung Fong had no home market sales. And, by February 7, 2000 at the latest, Tung Fong had put the Commerce Department squarely on notice of that fact. Pub. Doc. 26.

The Government relies heavily on a pair of cases to argue, in essence, that after-acquired information concerning inaccuracies in a petition does not require the Commerce Department to rescind the initiation of an investigation. *See* Def.'s Brief at 20-21 (*citing* Luciano Pisoni Fabbrica Accessori Instrument Musicali and Enzo Pizzi, Inc. v. United States, 10 CIT 424, 427-28, 640 F. Supp. 255, 258 (1986) (finding that the "statutory scheme offers no basis for [the] position that Commerce is required to rescind a notice of initiation of an investigation upon discovering inaccuracies in a petition.") *and* United States v. Roses Inc., 1 Fed. Cir. 39, 706 F. 2d 1563, 1566 (1983) ("[W]hen there is a petition sufficient on its face, and as checked against other 'facts within the public domain,' even if the investigation would appear unwarranted to one who knew all the facts, surely the investigation must still be commenced.")). But those cases are simply inapposite here, for at least three reasons.

First, the "inaccurate" information supplied in the instant petition did not concern some minor, peripheral, collateral or ancillary point. Rather, that information was the very linchpin of the investigation. Because their petition alleged no other basis for an investigation, the truth of the Domestic Manufacturers' claims of Tung Fong's home market sales was absolutely indispensable to the adequacy of the petition. Moreover, the source of the Domestic Manufacturers' claims of home market sales by Tung Fong was not some external, third party source, but – rather – research

expressly commissioned, and paid for, by the Domestic Manufacturers themselves. Thus, they cannot be heard to disclaim responsibility for its reliability. Finally, it elevates form over substance to characterize as merely "inaccurate" the false information at issue here. The spectre of fraud hangs heavy in the air. At a bare minimum, the record suggests that someone very close to the Domestic Manufacturers was making damaging allegations with full knowledge of their consequences and a reckless disregard for their truth.

The Government's reading of the statute and the regulations would seem to leave the Commerce Department and innocent respondents at the mercy of hypothetical unscrupulous petitioners willing to fabricate evidence and able to sustain their lie at least long enough to get an investigation launched. But there can be no suggestion that Congress intended to license domestic industries to prevaricate in order to initiate investigations, which could then be used as "fishing expeditions" in a quest for other, *truthful* evidence of dumping.

Although Tung Fong asserts that, under the circumstances here, "[t]he anti-dumping order resulting from [the] investigation must be revoked," the case on which it relies does not support that proposition. Pl.'s Brief at 4 (*citing* Mitsui v. United States, 18 CIT 185 (1994)). As discussed below, this action must be remanded to the Commerce Department for other reasons. On remand, both at the administrative level and then before the Court, the parties will have ample opportunity to grapple with the consequences of the falsehoods tainting the petition underlying this matter.

### B. The Agency's Use of "Adverse Facts Available"

Tung Fong also asserts that – assuming, *arguendo*, that the investigation here was proper – the Commerce Department's use of "adverse facts available" in calculating the company's dumping

margin was not in accordance with law. Specifically, Tung Fong disputes the Department's determination that the company "failed to cooperate by not acting to the best of its ability" in responding to the agency's requests for information. Pl.'s Brief at 5.[7]

As summarized in section I.A above, the statute restricts the Commerce Department's use of "facts available" to situations where "necessary information is not available" or where a party withholds information, fails to provide requested information by the deadline or in the form and manner requested, significantly impedes the investigation, or where the proffered information cannot be verified. 19 U.S.C. § 1677e(a); 19 C.F.R. § 351.308(a).

As section I.A explains, the statute also restricts the Commerce Department's discretion in selecting among the "facts available." Thus, the agency may invoke an "adverse inference" in selecting among facts available only if it makes the further finding that the party in question has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b); *see also* Borden, Inc. v. United States, 22 CIT 233, 263-64, 4 F. Supp. 2d 1221, 1246 (1998) (faulting Commerce Department's failure to adequately consider whether the respondent was capable of responding to agency's data requests). Any such finding must be "reached by 'reasoned decisionmaking,' including . . . a reasoned explanation supported by a stated

---

[7]Tung Fong asserts, in the alternative, that the Commerce Department's selection of "a high aberrant calculated dumping margin as adverse [facts available]" was unwarranted. Pl.'s Brief at 5. Tung Fong thus challenges both the use of "adverse facts available" and the particular adverse facts selected by the agency for use in calculating the company's dumping margin.

However, as explained more fully below, the Commerce Department failed to adequately justify its resort to adverse facts available against Tung Fong. There is, therefore, no need to reach the company's alternative claim.

connection between the facts found and the choice made." Elec. Consumers Res. Council v. Fed. Energy Reg. Comm., 747 F.2d 1511, 1513 (D.C. Cir. 1984) (*citing* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962)). Commerce Department actions which are unsupported by reasoned explanation may be deemed "arbitrary and capricious." *See* Steel Auth. of India, Ltd. v. United States, 25 CIT ___, ___ n.10, 149 F. Supp. 2d 921, 929 n.10 (2001).

The essence of the Commerce Department's justification for the use of "adverse facts available" here is its claim that Tung Fong withheld information. The Department found that Tung Fong "had the information necessary to perform a time-based calculation [] before the initiation of the case, and certainly at the time it received the [antidumping investigation] questionnaire." Decision Memo at 8, Pub. Doc. 141 at 8. But the agency's determination that Tung Fong could have provided "time-based" cost allocation data (based on "machine times") cannot be squared with the record facts.

As discussed in section I.B above, the Commerce Department was understandably confused by Tung Fong's use of the term "machine times" in its initial section D questionnaire responses. However, as section I.B further explains, there was no longer any room for confusion by the time the agency had completed its verification. The Commerce Department verification personnel specifically confirmed that Tung Fong does not track actual "machine times." The agency personnel further determined that the "machine time factors" that the company initially attempted to use to calculate depreciation expense were not, in fact, machine times. In addition, they determined that

the "machine times" that Tung Fong had considered, then rejected, as a basis for allocating certain direct labor costs were actually "machine time *estimates*"– estimates that, according to Tung Fong's uncontroverted statements of explanation, were unreliable. Verification Report at 21, Pub. Doc. 124 at 21.

There is thus no basis in fact – much less the record – for the finding in the Commerce Department's Decision Memo that Tung Fong had "model specific processing times available" and refused to "explain why it would not provide this information." Verification Report at 7, Pub. Doc. 124 at 7. Certainly the agency verification personnel knew that the company did not have such "machine times" available; all the company had were "machine time *estimates*" – and even those were not available for all fittings and processes. Even more importantly, as Tung Fong advised the Commerce Department, the estimates were proven to be unreliable.

Although its precise position is somewhat unclear, the Government appears to suggest that – even if Tung Fong did not have true "machine times" available for all of its 700-plus fittings at the beginning of the investigation – it had ample time to obtain the data in the course of the investigation, notwithstanding its "limited number of employees." Def.'s Brief at 28. "After all," the Government concludes, "Commerce's verifiers were able to allocate costs using the time method for 13 products without difficulty during the verification." *Id*. (citation omitted). There are at least two flaws in such a position.

First, the Commerce Department made no findings on the extent of Tung Fong's resources (or lack thereof), and pointed to no evidence to support the Department's conclusory assertion that

– notwithstanding the company's limited resources – "had it chosen to do so, [the company] would easily have been able to calculate the necessary allocations" within the time allotted. Nothing in the record effectively refutes Tung Fong's claim that:

> Tung Fong, an extremely small family-owned Philippine company, run by one person, was not able to provide [the Commerce Department with the] requested cost data within the limited time available given (a) Tung Fong's lack of a cost accounting system; and (b) [the fact that] Tung Fong sold over 700 different types of fittings, making the development of any allocation of cost[s] based on *observed processing time* to produce each type of fitting difficult.

Pl.'s Brief at 5 (emphasis added).

Nor does the handful of allocation calculations performed by the Commerce Department's verification personnel – which the Government appears to cite as evidence – prove anything about the feasibility of obtaining true "machine times" for all of Tung Fong's fittings. As discussed above, the verification personnel used mere "machine time *estimates*" – not actual, observed "machine times," as the Government seems to suggest. And those "machine time estimates" were data that Tung Fong had on hand; the agency verification personnel did nothing to collect the data. Moreover, the estimates were incomplete (*i.e.*, there were estimates for only a limited number of processes) and, in any event, they had been proven to be unreliable.

In short, the record is simply devoid of evidence to support either the Commerce Department's finding that Tung Fong withheld critical information that it had in its possession, or the agency's finding that it would have been – as a practical matter – feasible for Tung Fong to have obtained actual "machine times" to respond to the agency's request for time-based cost allocation data during the course of the investigation.

The Government maintains that the Commerce Department's resort to "adverse facts available" was also justified because Tung Fong allegedly "fail[ed] to perform due diligence on its assertions about the accuracy and reliability" of the weight-based cost allocation data that the company provided to the Department. Def.'s Brief at 23 (*citing* Decision Memo at 7). In an effort to support that charge, the Government points to the analysis performed by Commerce Department verification personnel, which concluded that "the results generated by Tung Fong's weight and time-based methods did not mirror each other." Def.'s Brief at 29 (*quoting* Verification Report at 21). The Commerce Department criticizes Tung Fong for not performing that analysis itself.

However, for all the reasons detailed in section I.B above, the Commerce Department's reasoning on this point is fundamentally flawed. In sum, the discrepancy between the verification personnel's cost allocation calculations using the discredited "machine time *estimate*" data and those using Tung Fong's weight-based methodology was to be expected. And Tung Fong can hardly be faulted as lacking in "due diligence" simply because it failed to perform an illogical analysis using data which had been proven to be unreliable, which would – at most – have established what the company already knew (and, indeed, had told the Commerce Department).

Moreover, as section I.B explains, the discrepancy identified by the verification personnel's analysis does nothing to cast doubt on the reliability of Tung Fong's weight-based cost allocation methodology. Thus, there can be no suggestion that the use of adverse facts available was warranted because Tung Fong provided Commerce with an alternate allocation method *that was found at*

*verification to be inaccurate.*" Def.'s Brief at 29 (emphasis added). Contrary to the Government's

claims, the Commerce Department has pointed to no evidence to substantiate its accusation that

Tung Fong "provid[ed] an inaccurate cost allocation methodology." *Id.*

In the alternative, the Government argues that the Commerce Department was entitled to

resort to adverse facts available because Tung Fong assertedly "fail[ed] to provide information [to

the agency] in a timely manner." Def.'s Brief at 23. According to the Government:

> Commerce also found that Tung Fong was uncooperative because of the frequency
> with which it responded in an untimely manner to Commerce request[s] for
> information. Moreover, Tung Fong filed untimely responses despite numerous
> extensions that were granted by Commerce. Finally, there were several instances
> where Tung Fong submitted responses to questions after the required deadline, in
> effect granting itself an extension.

Def.'s Brief at 29 (*citing* Decision Memo at 7-8).

To be sure, the Commerce Department may resort to "facts available" where a party fails to

make timely submissions. *See* Seattle Marine Fishing Supply Co. v. United States, 12 CIT 60, 71,

679 F. Supp. 1119, 1128 (1988). However, the agency may resort to "*adverse* facts available" only

where it finds that the party failed to act to the best of its ability. *See*, *e.g.*, Nippon Steel Corporation

v. United States, 24 CIT 1158, 1169, 118 F. Supp. 2d 1366, 1377 (2000), *vacated in part on other*

*grounds after remand*, 337 F.3d 1373 (Fed. Cir. 2003). The Government points to no evidence here

which would support such a finding.

In seeking extensions of time, Tung Fong explained, for example, that the questionnaire

process was "overwhelming for a small company the size of Tung Fong," emphasizing that the

"individual answering the questionnaire [was] also running the company." Pub. Doc. 98. The

burden on Tung Fong was further compounded by the fact that – as the Commerce Department

confirmed – the company had no pre-existing accounting system allocating costs among the more than 700 different fittings in its product line. Verification Report, Pub. Doc. 124 at 20.

As discussed above, the Commerce Department failed to point to any concrete evidence to substantiate its charge that Tung Fong could have complied with the agency's requests for information in a more timely fashion. Indeed, the record suggests that even the most well-heeled respondent might have had trouble meeting the tight deadlines that the Commerce Department imposed on Tung Fong in this investigation.

As discussed above in section I.B, the Commerce Department did not treat Tung Fong even as a voluntary respondent until late in the investigation, after Enlin (the agency's designated "mandatory respondent") withdrew from the investigation. Thus, the Commerce Department did not even begin the supplemental questionnaire process vis-a-vis Tung Fong until late July 2000 – several months later than the other respondents in the other countries subject to the investigation. Pub. Doc. 139 at 7. Indeed, in opposing Tung Fong's participation as a voluntary respondent in the investigation, the Domestic Manufacturers themselves expressed concern that – even with an "aggressive timetable" – a full investigation of Tung Fong could not "reasonably be completed" within the time then remaining on the statutory clock for the investigation. Pub. Doc. 75 at 29.

As noted elsewhere, the Commerce Department made no findings on the extent of Tung Fong's resources (or lack thereof), and pointed to no evidence to support its conclusory assertion that – notwithstanding Tung Fong's limited resources – the company could have responded to the agency's requests for information in a more timely fashion. Accordingly, like the agency's other proffered justifications for resort to adverse facts available, this rationale too must fail.

In sum, based on the record compiled in this matter, the Commerce Department improperly resorted to adverse facts available – instead of using the weight-based cost allocation data provided to the agency by Tung Fong – in calculating the company's dumping margin.

### C.  The Calculation of the "All Others" Rate

Tung Fong's final argument challenges the "all others" dumping margin for non-investigated Philippine producers, which the Commerce Department set at equal to the weighted-average dumping margin for Tung Fong.[8]  The "all others" rate thus reflects the use of "adverse facts available."  Final Determination, 65 Fed. Reg. at 81,825.  Tung Fong maintains that the Commerce Department may not include dumping margins based on adverse facts available in the calculation of the "all others" rate, because – according to the company – such a use of adverse facts available is prohibited by the antidumping statute and the related Statement of Administrative Action, and contravenes the United States' WTO obligations.  Pl.'s Brief at 8.

The Government, notably, does not defend the propriety of the Commerce Department's calculation of the "all others" rate.  Rather, the Government argues that, because Tung Fong was individually investigated and assigned its own margin rate, the company "has not been injured in fact

_____

[8]Although Tung Fong's briefs frame its argument on this point in terms of the use of adverse facts available in calculating its dumping margin, the Commerce Department also resorted to adverse facts available in calculating Enlin's margin.  Decision Memo at 11, Pub. Doc. 141 at 11.  The conclusion in section II.B above thus does not moot Tung Fong's argument, since the "all others" rate will reflect the use of adverse facts available even if they are not used to calculate Tung Fong's rate.

and [therefore] lacks constitutional standing" to raise this argument. Def.'s Brief at 34. The Government reasons, in other words, that because Tung Fong is not subject to the "all others" rate, it may not challenge it.

Tung Fong counters that it is affected by the "all others" rate, because – in the future – other Philippine companies intending to export to the United States conceivably could subcontract the manufacture of fittings to Tung Fong. Tung Fong reasons that, since any such companies would be subject to the "all others" rate, "[t]he 'all others' rate [would] affect[] . . . Tung Fong's ability to enter into [subcontracting] transactions." Pl.'s Reply Brief at 8.

Quite apart from the issue of the legality of the calculation of the "all others" rate in this case, a party granted its own dumping margin generally lacks standing to challenge the "all others" rate. *See* Torrington Co. v. United States, 21 CIT 251, 263, 960 F. Supp. 339, 349 (1997); Fag Italia S.p.a. v. United States, 20 CIT 1377, 1384-85, 948 F. Supp. 67, 73 (1996). Tung Fong advances no compelling reason why that principle should not apply with equal force here.

Tung Fong's argument that it may, in the future, enter into subcontracts with companies subject to the "all others" rate is simply too speculative. *See, e.g.*, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1991) (holding that environmental groups that might someday return to a contested habitat did not meet the "actual or imminent" standard required for "injury in fact"). Thus, because there is no showing that Tung Fung may suffer cognizable injury as a result of the "all others" rate, the company's challenge to the calculation of that rate must be rejected for lack of standing.

## III.  <u>Conclusion</u>

For the reasons set forth above, Plaintiff's Motion for Judgment on the Agency Record is granted in part.  This action is remanded to the Department of Commerce to enable it to reconsider the adequacy of the Domestic Manufacturers' petition, and the consequences of the falsity of their allegations of home market sales by Tung Fong; to allow the Department to reconsider its decision to resort to adverse facts available in calculating Tung Fong's antidumping duty margin (and, if appropriate, to reevaluate the particular adverse facts selected by the agency); and to accord the Department the opportunity to fully articulate the reasoning underlying its findings, conclusions and determinations.

A separate order will enter accordingly.

/s/      Delissa A. Ridgway
Judge

Decided:   April 7, 2004
                New York, New York