GILMORE STEEL CORPORATION,
Plaintiff,

v.

UNITED STATES, et al., Defendants,

Societe Anonyme De Fabrique De Fer
De Charleroi, and Societe Anonyme
De Forges De Clabecq, Intervenors.

Court No. 84–2–00228.

United States Court of International
Trade.

April 23, 1984.

Heller, Ehrman, White & McAuliffe, San Francisco, Cal. (John H. Cutler, Rene P. Tatro, and John S. Yun, San Francisco, Cal., on briefs), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C. (Francis J. Sailer, Washington, D.C., on briefs), for defendants.

Robert M. Gottschalk, New York City (Sidney N. Weiss, New York City, on briefs) for intervenors.

### Opinion and Order

MALETZ, Senior Judge:

In this action plaintiff Gilmore Steel Corp. challenges the government's rescission of a notice initiating an antidumping proceeding, as well as its dismissal of plaintiff's antidumping petition. The crux of the parties' dispute focuses on the phrase "on behalf of an industry" contained in section 732(b) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, 19 U.S.C. § 1673a(b) (1982). Section 1673a provides in part:

§ 1673a. *Procedures for initiating an antidumping duty investigation*

\*    \*    \*    \*    \*    \*

(b) *Initiation by petition*

(1) *Petition requirements*

An antidumping proceeding shall be commenced whenever an interested party ... files a petition with the administering authority, *on behalf of an industry*, which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations. The petition may be amended at such time, and upon such conditions, as the administering authority and the Commission may permit. [Emphasis added.]

The term "industry" is defined in general as

the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product.

19 U.S.C. § 1677(4)(A) (1982).

The questions presented are fourfold. First, does "on behalf of an industry" mean "as the representative of an industry," as the government contends; or does it merely refer to the scope of relief sought by the petitioner, i.e., relief which would inure to the benefit of an industry, as Gilmore maintains? Second, does the term "industry" as used in section 1673a(b) refer only to national industries, or does it include regional industries as well? The third inquiry—and in Gilmore's view the overriding question—is whether the Department of Commerce, International Trade Administration (ITA), had the power to dismiss Gilmore's petition well after the 20-day period had run for determining the sufficiency of its petition. *See* 19 U.S.C. § 1673a(c), discussed *infra*. Fourth, assuming that certain ex parte communications took place between the ITA and officials of the European Economic Community, what bearing, if any, does that have on the outcome of this action?

As to the first two inquiries, the court believes that a petitioner must present an antidumping petition in a representative capacity, but that it may do so on behalf of either a regional or national industry. The court is also of the view that the ITA had the power to dismiss Gilmore's petition after the 20-day petition determination period of section 1673a(c) had run, insofar as that petition purported to represent the national hot-rolled carbon steel plate industry. However, to the extent Gilmore's petition alleged in the alternative less-than-fair-value (LTFV) sales and injury to a *regional* industry, it was error for the ITA to dismiss it. And as for the alleged ex parte communications, the court finds any error in that connection harmless.

Accordingly, for the reasons that follow, the ITA's determination is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

## Background

Approximately one year before Gilmore filed its antidumping petition, an eleventh-hour agreement had been reached among the Commerce Department, the major U.S. steel producers, and the European Economic Community (EEC or EC), whereby the EEC agreed to restrict its exports of steel products to the United States in exchange for the U.S. steel industry's commitment to drop all pending antidumping and countervailing duty proceedings against the EC steel producers. See 47 Fed.Reg. 49,058 (Oct. 29, 1982). This agreement, generally referred to as "the Arrangement," was not acceded to by all domestic steel producers, Gilmore being one such nonsignatory. The Arrangement allows for abrogation by the EC producers if any U.S. producer—signatory or nonsignatory—files an antidumping petition respecting EC carbon steel products.

During 1983 Gilmore sustained what it characterizes as a deteriorating business condition due to imports of hot-rolled carbon steel plate in cut lengths (steel plate) from Belgium and West Germany—both EC members. Gilmore therefore petitioned the ITA on September 29, 1983, for initiation of an antidumping investigation pursuant to 19 U.S.C. § 1673a(b)(1). With regard to both the alleged Belgian and West Germany LTFV sales, the petition was brought "on behalf of" all U.S. producers of steel plate. Alternatively, however,

with respect to LTFV sales from West Germany, the petition was brought on behalf of a regional industry only, comprising West coast steel plate producers. At the time the petition was filed that regional industry numbered two producers—Kaiser Steel Corp. and Gilmore. By the end of 1983 their number had been winnowed to one, Gilmore being the sole survivor.

Within 20 days of Gilmore's filing the ITA made an affirmative determination under 19 U.S.C. § 1673a(c)[1] that the petition set forth the allegations necessary for imposition of antidumping duties. Notice of the commencement of an investigation was, accordingly, published in the Federal Register on October 25, 1983. 48 Fed.Reg. 49,322. The ITA simultaneously notified the International Trade Commission (ITC) that a preliminary injury investigation should be undertaken. See 19 U.S.C. § 1673a(d). On November 7, 1983, a unanimous ITC rendered an affirmative preliminary injury determination, but only insofar as the national steel plate industry was concerned. There was no regional industry determination by the full ITC. See Determination of the Commission in Investigations Nos. 731–TA–146 and 147 (Preliminary) Under the Tariff Act of 1930, Together with the Information Obtained in the Investigation, USITC Pub. No. 1451 (Nov. 1983) (the ITC Report).

Two months after the ITC Report the ITA published the following notice in the Federal Register, purporting to rescind its earlier notice commencing the investigation, and dismissing Gilmore's petition:

[T]he Department has determined that Gilmore's petition was not filed on behalf of a United States industry and that this

---

1. 19 U.S.C. § 1673a(c) provides:

(c) *Petition determination*
Within 20 days after the date on which a petition is filed under subsection (b) of this section, the administering authority shall—
(1) determine whether the petition alleges the elements necessary for the imposition of a duty under section 1673 of this title and contains information reasonably available to the petitioner supporting the allegations,
(2) if the determination is affirmative, commence an investigation to determine whether

the class or kind of merchandise described in the petition is being, or is likely to be, sold in the United States at less than its fair value, and provide for the publication of notice of the determination in the Federal Register, and
(3) if the determination is negative, dismiss the petition, terminate the proceeding, notify the petitioner in writing of the reasons for the determination, and provide for the publication of notice of the determination in the Federal Register.

earlier initiation was not well founded. This conclusion is based on the following facts, which came to light only after our initial decision to initiate.

At an ITC public conference held on October 26, 1983, Gilmore was the only producer of this merchandise to testify in support of the petition. Conversely, letters were submitted by Armco Inc., to the Department and by United States Steel Corp., to the ITC specifically indicating that these firms do not support Gilmore's petition. Given this absence of support from Armco Inc., and United States Steel Corp., the Department had reason, for the first time, to question whether the petition was, in fact, properly filed on behalf of a domestic industry, and asked other U.S. carbon steel plate producers if they supported Gilmore's petition. Written replies were received from: Bethlehem Steel Corp., Inland Steel Co., Jones and Laughlin Steel Inc., Lukes Steel Co., National Steel Corp., Phoenix Steel Corp., U.S. Steel Corporation and Republic Steel Corp. All of these—except Bethlehem, which did not take a position—indicated that they do not support Gilmore's petition.

49 Fed.Reg. 3503, 3504 (Jan. 27, 1984).

Thus, on the basis of information received after the running of the 20-day period spelled out in 19 U.S.C. § 1673a(c), the ITA reconsidered the sufficiency of and dismissed Gilmore's petition, concluding that it had not been brought "on behalf of an industry" since the petition lacked the support of a majority of domestic steel plate producers. The ITA did not stop there, however. It went one step further, concluding that since only one ITC commissioner had discussed the regional industry issue, the ITC had thereby rendered a negative determination as to the existence of a regional industry. 49 Fed.Reg. 3504. Con-

sequently, Gilmore's *entire* petition was dismissed.

Having thus been shunted by the ITA, Gilmore brought this present action, requesting a preliminary injunction which, in effect, seeks the ultimate relief sought in its complaint—continuation of the entire investigation. The government has moved for summary judgment. At a consolidated hearing on these two motions, the parties agreed that the matter could be considered as cross-motions for summary judgment.[2] *Compare* rule 65(a)(2) of the rules of this court (hearing on preliminary injunction may be combined with trial on merits).

With this factual and legal backdrop, the court addresses the threshold issue: may the ITA, having rendered its determination to commence an antidumping proceeding, reconsider that determination, rescind it, and terminate the investigation in midstream on the basis of information which is neither within the petition nor part of the public domain?

### Reconsideration of Decision to Commence Investigation

While comprising three counts of its five-count complaint, Gilmore's contentions regarding the procedural aspects of the dismissal of its petition boil down to one. In Gilmore's view, once the 20-day period for considering the sufficiency of a petition has run, and the decision to commence the investigation has been made, the investigation must proceed to a final determination especially where, as here, a preliminary affirmative injury determination has already been reached by the time the ITA decides to dismiss the petition. The court cannot agree.

As the court understands it, Gilmore's argument envisions an administrative juggernaut that, once set into motion, can only be derailed by either a negative injury or

**2.** Intervenors Societe Anonyme de Fabrique de Fer and Societe Anonyme de Forges de Clabecq, both Belgian producers of hot-rolled carbon steel plate, have filed motions to dismiss, alleging procedural defects in Gilmore's service of the summons and complaint on them, the government and the domestic producers. Inas-

much as Gilmore's complaint is being dismissed insofar as it affects Belgian steel plate, intervenors' motions to dismiss are denied as moot. And to the extent intervenors complain of similar procedural defects relative to Gilmore's service on domestic producers and the government, they lack standing to do so.

negative LTFV sales determination. The court finds no support for this position in either the statute itself or its legislative history.

■ There is no question that within the 20-day determination period of section 1673a(c) the ITA must decide whether or not to initiate an investigation. *United States v. Roses, Inc.*, 706 F.2d 1563, 1569 (Fed.Cir.1983); S.Rep. No. 249, 96th Cong., 1st Sess. 63 (1979), *reprinted in* 1979 U.S. Code Cong. & Ad.News 381, 449. The agency did so here. But having combed the Trade Agreements Act of 1979 and its legislative history the court is unable to discern in either any prohibition against the ITA's reconsideration of that determination in order to correct a manifest error which taints the proceeding.[3]

In the court's view, the ITA must be so empowered. If it was otherwise, arbitrary and capricious agency practice would be the inevitable by-product. For Gilmore's position, if adopted, would obligate the agency to continue with an investigation in the knowledge that there existed a defect in the proceedings which could result in reversal by this court. *See Greene County Planning Board v. FPC*, 559 F.2d 1227, 1233 (2d Cir.1976) ("an agency does have an obligation to make corrections ... [where] the new evidence offered, if true, would clearly mandate a change in result ..."), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The ITA's decision to rescind was based on its conclusion that Gilmore's petition had not been brought "on behalf of an industry"—a finding that Gilmore lacked standing to bring the petition. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 63 (1979). That is precisely the sort of correction which the ITA must be allowed to make after section 1673a(c)'s 20-day period has run. To require the ITA to continue an obviously unwarranted investigation, simply because

material inaccuracies in the petition do not come to its attention until after the expiration of the 20-day period, flies in the face of reason. *See Asahi Chemical Industry Co. v. United States*, 4 C.I.T. 120, 128, 548 F.Supp. 1261, 1267 (1982).

■ It is axiomatic that courts have the power and the duty to correct judgments which contain clerical errors or judgments which have issued due to inadvertence or mistake, and to do so *sua sponte*. Fed.R.Civ.P. 60(a). It is equally well established that jurisdictional defects can be raised at any time, and *sua sponte* as well. *Rath Packing Co. v. Becker*, 530 F.2d 1295 (9th Cir.1975), *aff'd*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); Fed.R.Civ.P. 12(h)(3). A similar power must be vested in the ITA. "In fact, the presence of authority in administrative officers and tribunals to correct such errors has long been recognized...." *American Trucking Associations v. Frisco Transportation Co.*, 358 U.S. 133, 145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958). *See Bookman v. United States*, 453 F.2d 1263, 197 Ct.Cl. 108 (1972) (administrative agency is empowered to correct errors). A contrary holding would be tantamount to saying that once an error initially evades detection, the ITA is thereafter powerless to take remedial steps, thereby compounding the error.

Here, the defect in Gilmore's petition, according to the government, went to its standing—not only whether Gilmore was an "interested party," but also whether Gilmore had the requisite support of the industry to warrant invocation of the ITA's jurisdiction and to justify the exercise of that agency's remedial powers. *Compare Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (the concept of standing is part of the limitation on federal court jurisdiction); *Warth v. Seldin*, 422

---

**3.** Gilmore's reliance on *Babcock & Wilcox Co. v. United States*, 2 C.I.T. 74, 521 F.Supp. 479 (1981) (reconsideration beyond statutory time periods unlawful), *vacated as moot*, 4 C.I.T. 3 (1982), is ill-founded since, having been vacated, it is no longer binding precedent. *Compare Cohen v.*

*Illinois Institute of Technology*, 524 F.2d 818, 829–30 n. 33 (7th Cir.1975) (a court of appeals' decision having been withdrawn, it has no precedential value), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976).

U.S. 490, 498, 95 S.Ct. 2197, 2204, 2205, 45 L.Ed.2d 343 (1975). Being an aspect of the ITA's jurisdiction, the court cannot find the ITA in error for raising it *sua sponte*, nor for dismissing Gilmore's petition in part on that basis. Whether the ITA's legal conclusion regarding Gilmore's standing is well founded, the court considers in a later portion of this opinion.

In sum, when the purpose of reconsideration is to correct a decision based upon manifest error—such as one implicating defects jurisdictional in nature—reconsideration is essential to the proper administration of justice.

Having established that the ITA had the power to reconsider its decision to initiate the investigation, the next inquiry is whether, as a substantive legal matter, it properly dismissed Gilmore's petition on the ground that Gilmore had not brought the petition "on behalf of an industry."

### Dismissal of Gilmore's Petition

As previously noted, the heart of the present controversy turns on the meaning of the phrase "on behalf of an industry" contained in section 1673a(b). Gilmore submits that it refers to the scope of relief being sought by the petitioner. The government contends that the plain language of that phrase refers to the extent of producer support within an industry. Gilmore counters that if "on behalf of an industry" requires a petitioner to be the representative of an industry, then the "interested party"[4] criterion of section 1673a(b) is redundant because a petitioner who has garnered industry support will also invariably be an "interested party," i.e., a person with sufficient "interest" in the outcome to have standing before the

ITA. The government responds, however, that Gilmore's reading of section 1673a(b) would reduce "on behalf of an industry" to a nullity since, by statute, relief is automatically accorded to an industry once LTFV sales and injury have been affirmatively determined.

The court is persuaded by the government's argument, and for the following reason.

It is, of course, hornbook law that "[t]he starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). The Supreme Court has in fact warned that "[g]oing behind the plain language of a statute in search of a possibly contrary congressional intent 'is a step to be taken cautiously' even under the best circumstances." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748 (1982) (quoting *Piper v. Chris-Craft Industries,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977)). Indeed, "[a]bsent a clearly expressed legislative intention to the contrary, [the] language [of the statute] must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *See Shields v. United States,* 698 F.2d 987, 989 (9th Cir.1983). The court believes that the plain meaning of "on behalf of" is "as the representative of," "as the proxy for," or "as the surrogate of." *See, e.g.,* Random House College Dictionary 122 (1982) ("1. *in* or *on behalf of,* as a representative of or a proxy for"). The court has consulted the legislative his-

---

**4.** 19 U.S.C. § 1677(9) defines "interested party" as

(A) a foreign manufacturer, producer, or exporter or the United States importer, of merchandise which is the subject of an investigation under this subtitle or a trade or business association a majority of the members of which are importers of such merchandise,

(B) the government of a country in which such merchandise is produced or manufactured,

(C) a manufacturer, producer, or wholesaler in the United States of a like product,

(D) a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a like product, and

(E) a trade or business association a majority of whose members manufacture, produce, or wholesale a like product in the United States.

tory and has found no contrary intent. *See Schramm v. Department of Health & Human Services,* 682 F.2d 85, 91 (3d Cir.1982) (where Congress in plain language has expressed its intention, and the legislative history does not demonstrate a contrary purpose, a court is bound to follow the statutory provision as written).

Mindful, however, of Learned Hand's admonition "not to make a fortress out of the dictionary," *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), the court finds additional support for this conclusion within the very framework of the Trade Agreements Act of 1979. As the government points out, the relief sought under an antidumping petition automatically inures to the benefit of the affected industry if that petition is ultimately sustained. If affirmative LTFV sales and injury determinations are reached, then under 19 U.S.C. § 1673b(d) liquidation of all entries of the subject merchandise is suspended and estimated antidumping duties imposed. Given this situation, adopting Gilmore's view of section 1673a(b) would require a petitioner to go through the hollow ritual of including in its petition the incantation "on behalf of an industry." Gilmore's interpretation of "on behalf of an industry" thus reduces that phrase to a redundancy, given that industry-wide relief is already accorded every successful petitioner under section 1673b(d).

As for Gilmore's suggestion that the government's argument reduces the term "interested party" to mere surplusage, this ignores the definition of that term found in section 1677(9). For unless a petitioner is either a producer, union, or trade association *within that industry,* it cannot acquire "interested party" status in an antidumping proceeding. 19 U.S.C. § 1677(9)(C), (D) & (E). *See Zenith Radio Corp. v. United States,* 5 C.I.T. ——, Slip Op. 83–32 (April 13, 1983). This fairly narrow circumscription closes the door on groups such as, for example, the U.S. Chamber of Commerce, the National Association of Manufacturers, and the American Association of Exporters and Import-

ers—groups which could conceivably muster majority support within a specific industry for an antidumping petition, but which could not attain "interested party" status under section 1677(9).

The "interested party" criterion of section 1673a(b) is thus the first in a two-step sifting process—not only must a petitioner be a member of the affected industry, i.e., be an "interested party," it must also show that a majority of that industry backs its petition. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 63 (1979) ("the standing requirements in section 732(b)(1) [19 U.S.C. § 1673a(b)(1)] for filing a petition [are] to provide an opportunity for relief to an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation [emphasis added].""). Guided by the elementary canon of construction that "a statute should be interpreted so as not to render one part inoperative," *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979), the court is convinced that "on behalf of an industry" carries the meaning advanced by the government.

In the present case there is no dispute that Gilmore does not have the support of a majority of the national steel plate industry. As indicated, the overwhelming majority of domestic steel plate producers scotched Gilmore's petition when contacted by the ITA. While not unsympathetic to Gilmore's plea of "tyranny of the majority," that is a matter for Congress to address, not this court. The looming antitrust problems are for another day in another forum. The short answer to Gilmore's claim of majority oppression is that the Trade Agreements Act of 1979 is drafted throughout in terms of relief to an industry, not to individual manufacturers or producers. *See* 19 U.S.C. §§ 1671a(b), 1671d(b), 1673b(a) & 1673d(b). *See also* S.Rep. No. 249, 96th Cong., 1st Sess. 63 (1979). Any untoward harshness resulting from this statutory scheme is ameliorated to a limited extent by 19 U.S.C.

§ 1677(4)(B),[5] which excludes from the industry headcount those producers who are related to importers or foreign manufacturers of the subject product, or who themselves import the allegedly dumped merchandise.

The ITA was thus correct in dismissing Gilmore's petition insofar as it was purportedly brought on behalf of the national steel plate industry. As to the propriety of that dismissal in connection with Gilmore's alternative regional industry claim, the court turns next.

### The Meaning of "Industry"

This phase of Gilmore's action is the most puzzling, not due to any difficulty either in coming to grips with the law or in Gilmore's presentation, but in understanding the reasons for the ITA's dismissal of this portion of Gilmore's petition. The government has, in the court's view, shifted positions on this question from the time it first dismissed the petition. Initially, it argued somewhat curiously that since the ITC had not made an affirmative finding of the existence of a regional industry, the negative inference was warranted that one did not exist. However, the fact of the matter is that the ITC felt no need to address this question, that issue being subsumed by its determination that injury existed in connection with a national industry. As the ITC Report put it:

> Having reached affirmative determinations of a reasonable indication of material injury to the U.S. cut-length and coiled plate industries as a whole, *Commissioners Stern, Haggart, and Lodwick do not reach the issues of* (1) whether the producers in the Western region should be treated as if they are a separate industry, and (2) if so, whether there is materi-

al injury to that industry or a threat thereof caused by the subject imports. *See* Additional Views of Chairman Eckes concerning the question of injury to a regional industry. [Chairman Eckes expressed the opinion that a regional industry did exist].

ITC Report, USITC Pub. No. 1451 at 8 n. 17 (emphasis added).

Yet, the ITA elected to dismiss the entirety of Gilmore's petition, proffering the following rationale:

> Although Gilmore had alleged that imports of this merchandise from the FRG had caused injury to a regional industry as defined in section 771(4)(C) of the Act, the conclusion of the ITC, as reflected in its report with respect to this merchandise (USITC Publication 1451 dated November 1983), contained only the views of Chairman Alfred Eckes on the regional injury question and did not include a determination that there was a regional industry or that there was a resonable [sic] indication of injury to such a regional industry. Since the ITC did not decide whether a regional industry existed within the meaning of section 771(4)(C) of the Act, the Department cannot conclude that Gilmore has properly filed its petition on behalf of a regional industry.

49 Fed.Reg. 3504.

Moving slightly away from this view in its briefs filed with the court, the government now contends that the question whether Gilmore has filed its petition "on behalf of a West coast regional industry" is simply indeterminate at this time. The court is at a loss to comprehend why Gilmore's petition should be dismissed even if the existence of a regional industry is, at this time, an indeterminate question.

---

**5.** That section provides:

(4) *Industry*

    *    *    *    *    *    *

(B) *Related parties*

When some producers are related to the exporters or importers, or are themselves importers of the allegedly subsidized or dumped merchandise, the term "industry" may be applied in appropriate circumstances by exclud-

ing such producers from those included in that industry.

The fact that certain producers are excluded from the term "industry" naturally gives rise to the question, excluded for what purpose? The obvious answer is that such interested producers are excluded for the purpose of determining the extent of industry support for a petition.

These waters are further muddied by the government's insistence that it is the exclusive function of the ITC to determine the existence of a regional industry.[6] But if Gilmore's petition cannot go forward because the ITA is not satisfied that it is brought on behalf of a regional industry, how will the ITC ever have the opportunity to consider the question? This "Catch-22" situation is an all too convenient bar to further agency consideration of Gilmore's petition.

Suffice it to say that the court finds the ITA's action wholly unsupportable in the law. First of all, there is no vice in pleading in the alternative when presenting an antidumping petition to the ITA. This has apparently become a customary practice. Secondly, although there is some suggestion in the government's brief that the phrase "on behalf of an industry" is limited to national industries, at oral argument the government conceded that the term "industry" includes both "regional" and "national" industries. Any other result would, of course, be so onerous as to be an absurdity. For, unless they could first gather support from the national producers of the like product, producers comprising a regional industry would be thwarted in their efforts to obtain relief under the Trade Agreements Act of 1979. Not only would such a result be unduly harsh, it would as a practical matter write section 1677(4)(C)—the regional industry provision—out of the statute. *See Colautti v. Franklin; Asahi Chemical Industry Co.,* 4 C.I.T. at 128, 548 F.Supp. at 1267 (" 'No rule of construction

necessitates ... acceptance of an interpretation resulting in patently absurd consequences.' ") (quoting *United States v. Brown,* 333 U.S. 18, 27, 68 S.Ct. 376, 381, 92 L.Ed. 442 (1948)). What is more, an examination of 19 U.S.C. § 1677(4) shows that while in general "industry" means the national producers of a product, "in appropriate circumstances" it may also mean a regional industry. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 83 (1979), U.S.Code Cong. & Admin.News 1979, p. 469 (" 'Industry' generally means: ...; or (3) a regional industry.").

In short, it was error for the ITA to have dismissed Gilmore's petition to the extent that it was brought on behalf of a West coast regional industry. The court expresses no view as to the existence of such a regional industry, that being a question to be answered in the first instance by the appropriate agency.

The court considers, finally, the question of the allegedly improper ex parte communications between the ITA and EC officials.

### *The Ex Parte Communications*

The fifth count of Gilmore's complaint alleges that the ITA reached its decision to dismiss Gilmore's petition on the basis of extralegal considerations—namely, threats by the EC to abrogate the Arrangement if Gilmore's petition was not dismissed. This information was allegedly in the form of undisclosed ex parte communications. Since this present matter is one on cross-

---

**6.** 19 U.S.C. § 1677(4)(C) defines a "regional industry" as follows:

(C) *Regional industries*

In appropriate circumstances, the United States, for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if—

(i) the producers within such market sell all or almost all of their production of the like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

In such appropriate circumstances, material injury, the threat of material injury, or mate-

rial retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a like product constitutes a major proportion of the total domestic production of that product, is not injured, if there is a concentration of subsidized or dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury, or if the establishment of an industry is being materially retarded, by reason of the subsidized or dumped imports.

motions for summary judgment, the court's function is to determine whether there are any issues of triable fact, accepting as true Gilmore's allegations. C. Wright, A. Miller & M. Kane, 10 Federal Practice & Procedure § 2712 at 574–78 (1983). The court finds none.

19 U.S.C. § 1677f(a)(3) provides:

(3) *Ex parte meetings*

The administering authority and the Commission shall maintain a record of ex parte meetings between—

(A) interested parties or other persons providing factual information in connection with an investigation, and

(B) the person charged with making the determination, and any person charged with making a final recommendation to that person, in connection with that investigation.

The record of the ex parte meeting shall include the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted. The record of the ex parte meeting shall be included in the record of the proceeding.

■ Ex parte communications per se are thus not improper, *see Roses, Inc.*, 706 F.2d at 1567, but a record of them must be maintained and made available. The government insists that no such communications took place, while Gilmore counters that they must have. The court believes that whether they did or not is irrelevant, amounting at most to harmless error, assuming they did take place.

■ First, since the court has ruled as a matter of law that Gilmore did not bring its petition on behalf of a national industry, it makes no difference to the outcome of this portion of Gilmore's case whether or not ex parte communications occurred between the EC and the ITA. Second, regarding the regional industry aspects of its petition, that portion of its action has been sus-tained and the ITA's dismissal invalidated. Gilmore has thus received all of the relief to which it is entitled at this stage. If there were unrecorded ex parte communications, the prejudice to Gilmore flowing from them has now been cured. As this court noted in *Timken Co. v. Regan*, 4 C.I.T. 174, 179, 552 F.Supp. 47, 52 (1982):

It is basic that procedural irregularities by an administrative agency are not per se prejudicial. *NLRB v. Seine & Line Fishermen's Union*, 374 F.2d 974, 981 (9th Cir.), *cert. denied sub nom. Biazevich v. NLRB*, 389 U.S. 913 [88 S.Ct. 239, 19 L.Ed.2d 261] (1967); 5 U.S.C. § 706. Material prejudice to the interests of the complaining party must clearly appear. *NLRB v. Selwyn Shoe Mfg. Corp.*, 428 F.2d 217, 224 (8th Cir. 1970).

Given the present disposition of this action, the court is unable to discern any material prejudice to Gilmore, assuming the existence of the alleged ex parte communications.

## Conclusion

For all the foregoing reasons, Gilmore's complaint is dismissed to the extent it seeks relief involving the ITA's determination that its antidumping petition was not brought on behalf of a national industry. Gilmore's action is sustained, however, insofar as the ITA's dismissal of the regional industry phase of its antidumping petition. The ITA's determination in that connection is hereby reversed. All remaining claims are dismissed, and the case remanded to the ITA for further proceedings consistent herewith.