**Slip Op. 05-39**

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————

TUNG FONG INDUSTRIAL CO., INC.,    :

    :

        *Plaintiff,*    :

    :

        v.    :        Court No. 01-00070

    :

UNITED STATES,    :

    :

        *Defendant.*    :

———————————————————:

[U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Remand are sustained.]

Decided: March 23, 2005

Miller & Chevalier Chartered (Peter J. Koenig), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Jeanne M. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Richard P. Schroeder); Philip J. Curtin, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

At issue in this action is the U.S. Department of Commerce's final affirmative antidumping determination imposing substantial duties on certain pipe fittings produced overseas and exported to the United States by companies including plaintiff Tung Fong Industrial Company, Inc. ("Tung Fong"), a small, family-owned Philippine manufacturer. *See* Notice of Final Determination of Sales

at Less Than Fair Value: Stainless Steel Butt-Weld Pipe Fittings From the Philippines, 65 Fed. Reg. 81,823 (Dec. 27, 2000) ("Final Determination").[1]

In brief, Tung Fong I found that the petition that launched the antidumping investigation here at issue falsely alleged that Tung Fong had made sales in its home market. *See* Tung Fong Indus. Co. v. United States, 28 CIT at ____, ____, 318 F. Supp. 2d 1321, 1331-33 (2004) ("Tung Fong I"). In addition, Tung Fong I rejected Commerce's determination that Tung Fong "failed to cooperate by not acting to the best of its ability" in responding to the agency's requests for information during the course of the investigation (which was the agency's asserted justification for its use of partial "adverse facts available" in calculating Tung Fong's antidumping margin). *See* Tung Fong I, 28 CIT at ____, 318 F. Supp. 2d at 1333-37.

Tung Fong I therefore remanded this matter to the Department of Commerce, "to enable it to reconsider the adequacy of the underlying antidumping duty petition, and the consequences of the falsity of the petition's allegations of home market sales by Tung Fong; to allow the Department to reconsider its decision to resort to adverse facts available in calculating Tung Fong's antidumping duty margin (and, if appropriate, to reevaluate the particular adverse facts selected); and to accord the agency the opportunity to fully articulate the reasoning underlying its findings, conclusions and determinations." Tung Fong I, 28 CIT at ____, 318 F. Supp. 2d at 1323; *see also* 28 CIT at ____, 318 F. Supp. 2d at 1338.

---

[1]Commerce's Final Determination assigned Tung Fong a dumping margin of 33.81% – the highest margin calculated for any of the 18 fittings manufacturers in the four countries under investigation. *See* Tung Fong Indus. Co. v. United States, 28 CIT ____, ____ n.4, ____, 318 F. Supp. 2d 1321, 1326 n.4, 1330-31 (2004) ("Tung Fong I").

Now pending before the Court are Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), together with the comments thereon filed by Tung Fong. *See* Letter from Counsel to Tung Fong to Clerk of the Court (Nov. 12, 2004) ("Plaintiff's Comments").[2] As a result of its reconsideration on remand, Commerce has recalculated the antidumping margin for Tung Fong. As revised, Tung Fong's weighted-average margin for the relevant period of investigation is 7.59%. *See* Remand Results at 19-20.[3]

As discussed more fully below, the Remand Results that Commerce has filed comply with Tung Fong I. They are, therefore, sustained.

## I. Analysis

### A. The Sufficiency of the Domestic Manufacturers' Petition

As Tung Fong I explained, Tung Fong's threshold attack on Commerce's Final Determination challenged the very premise of the underlying investigation. Specifically, Tung Fong argued that the antidumping petition filed by the domestic manufacturers was insufficient to justify an investigation, because the linchpin of that petition – the allegation that Tung Fong had home market sales during the period of investigation – was false. Pointing to its initial questionnaire responses, which attested (under oath) that the company had no home market sales of the merchandise at issue, Tung Fong emphasized that it put Commerce on notice of the relevant facts

---

[2]In light of the comments filed by Tung Fong, no Government response was necessary.

[3]Because the margin assigned to "all others" in Commerce's Final Determination was based on the margin that the agency had calculated for Tung Fong, Commerce is revising the "all others" rate to 7.59% as well. *See* Remand Results at 19.

*within one week of the initiation of the investigation*, but that the agency ignored that information and never looked back. *See* <u>Tung Fong I</u>, 28 CIT at \_\_\_\_, \_\_\_\_, 318 F. Supp. 2d at 1325-27, 1331-32; Pub. Doc. 26 at 2 (Tung Fong's February 7, 2000 response to Commerce's initial questionnaire concerning "Quantity and Value of Sales," indicating the total quantity and value of the company's "affiliated" and "unaffiliated" sales in its home market to be "NONE," "NONE," "NONE," and "NONE").

Significantly, in its response to Tung Fong's motion for judgment on the agency record, the Government did not dispute the veracity of Tung Fong's claim of no home market sales. Instead, the Government maintained that Commerce's hands were tied by the statute. Specifically, the Government argued that Commerce was permitted to decline to initiate an investigation only where the investigation would be "clearly frivolous" or where the petitioner failed to provide information reasonably available to it. The Government further asserted that, once an investigation is launched, the process marches inexorably on – absent an intervening negative determination by either Commerce or the International Trade Commission – until a final affirmative determination is made and an antidumping order is issued. *See* <u>Tung Fong I</u>, 28 CIT at \_\_\_\_, 318 F. Supp. 2d at 1332-33 (*citing* Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Brief") at 14-16). *But see* <u>Gilmore Steel Corp. v. United States</u>, 7 CIT 219, 585 F. Supp. 670 (1984) (sustaining Commerce's authority to reconsider the sufficiency of a

petition and terminate an investigation two months after issuance of an affirmative preliminary

determination, when a fundamental defect in the petition came to agency's attention) ("Gilmore").[4]

_____

[4]As Tung Fong I noted, the Government cited two cases as authority for its position. However, both can be distinguished from the instant case on several grounds. *See generally* Tung Fong I, 28 CIT at ____, 318 F. Supp. 2d at 1333 (*discussing* Luciano Pisoni Fabbrica Accessori Instrumenti Musicali and Enzo Pizzi, Inc. v. United States, 10 CIT 424, 426-27, 640 F. Supp. 255, 258 (1986), *and* United States v. Roses, Inc., 706 F.2d 1563, 1566 (Fed. Cir. 1983) ("Roses")).

Indeed, while the Government points to Roses to emphasize the narrow scope of Commerce's *pre-initiation* review of the sufficiency of a petition, Roses also expressly contemplates that an ongoing investigation may be *terminated* where information warranting such action is later put on the record by respondents, or otherwise comes to the attention of the agency:

> [W]hen there is a petition sufficient on its face, and as checked against other "facts within the public domain," even if investigation would appear unwarranted to one who knew all the facts, surely the investigation must still be commenced. *How long* [*that investigation*] *need be continued under such circumstances, we do not consider*.

Roses, 706 F.2d at 1566 (emphasis added).

The statute's relatively low threshold for the initiation of an investigation – and the absence of any opportunity for the targeted prospective respondents to submit information refuting a petition's allegations – make sense only if there is some sort of "safety valve" by which ongoing investigations which prove to be unwarranted can be terminated.

Significantly, neither party here cited the case that most closely parallels the case at bar. *See* Gilmore, 7 CIT 219, 585 F. Supp. 670. At issue in Gilmore was Commerce's determination to reconsider the sufficiency of a petition and terminate an ongoing antidumping investigation based on facts that came to the agency's attention only after the investigation was well underway.

Much like the Government here, the Plaintiff in Gilmore contended that "once the [statutory] period for considering the sufficiency of a petition has run, and the decision to commence the investigation has been made, the investigation must proceed to a final determination especially where, as [in that case], a preliminary affirmative injury determination has already been reached." 7 CIT at 222, 585 F. Supp. at 673. But the court made short work of that notion:

> [Plaintiff's] argument envisions an administrative juggernaut that, once set into motion, can only be derailed by either a negative injury or negative [Less Than Fair Value] determination. The court finds no support for this position in either the

Tung Fong I remanded the issue of the sufficiency of the domestic manufacturers' petition, questioning the notion that Commerce is utterly without power to terminate an ongoing investigation even where the agency becomes aware early in a proceeding of the falsity of information that is essential to the petition's sufficiency. Postulating the "worst case scenario":

> The Government's reading of the statute and the regulations would seem to leave the Commerce Department and innocent respondents at the mercy of hypothetical

statute itself or its legislative history.

7 CIT at 223, 585 F. Supp. at 673-74.

The Gilmore court continued:

> There is no question that within the [statutory period for assessing the adequacy of a petition], [Commerce] must decide whether or not to initiate an investigation. The agency did so here. But having combed the Trade Agreements Act of 1979 and its legislative history the court is unable to discern in either any prohibition against [Commerce's] reconsideration of that determination in order to correct a manifest error which taints the proceeding.

> In the court's view, [Commerce] must be so empowered. If it was otherwise, arbitrary and capricious agency practice would be the inevitable by-product.

7 CIT at 223, 585 F. Supp. at 674 (citations omitted).

As the court emphasized:

> To require [Commerce] to continue an obviously unwarranted investigation, simply because material inaccuracies in the petition do not come to its attention until after the expiration of the 20-day period, flies in the face of reason.
> . . . .
> A contrary holding would be tantamount to saying that once an error initially evades detection, [Commerce] is thereafter powerless to take remedial steps, thereby compounding the error.

7 CIT at 223-24, 585 F. Supp. at 674 (citations omitted).

unscrupulous petitioners willing to fabricate evidence and able to sustain their lie at least long enough to get an investigation launched. . . . [T]here can be no suggestion that Congress intended to license domestic industries to prevaricate in order to initiate investigations, which could then be used as "fishing expeditions" in a quest for other, *truthful* evidence of dumping.

Tung Fong I, 28 CIT at _____, 318 F. Supp. 2d at 1333.

On remand, Commerce reconsidered the sufficiency of the petition (focusing particularly on the truth of the allegations of home market sales), and any related implications for the termination of the investigation. The Remand Results explain:

The Department takes seriously the accuracy of the information upon which it bases antidumping investigations. The legitimacy of the antidumping investigation process requires that high standards of evidence be maintained throughout the entire proceeding, beginning with the petition. Thus, the Department requires that information contained in a petition be adequately supported.

Remand Results at 3.

Significantly, the Remand Results further state that, "[w]here [Commerce] find[s] that a petitioner has acted with reckless disregard for the truth when preparing a petition, [the agency] will terminate an investigation." *Id*.[5] The Remand Results emphasize, however, that Commerce

---

[5]This position contrasts with the position taken by the Government earlier in this action. As discussed above, the Government previously portrayed Commerce as powerless to terminate an investigation *for any reason* once it has been initiated (absent an intervening negative determination by one of the two relevant agencies). *See* Defendant's Brief at 15-16. *But see* Gilmore, 7 CIT at 224, 585 F. Supp. at 674 (rejecting same position initially taken by Commerce in this action, holding that it is "tantamount to saying that once an error initially evades detection, [Commerce] is thereafter powerless to take remedial steps, thereby compounding the error").

Even now, however, it is not clear that the Government has the standard right (although, for reasons discussed in greater detail below, it is no longer necessary to definitively resolve the issue here).

"distinguishes between the submission of information in which a petitioner has recklessly disregarded the truth and the submission of imperfect information which petitioner believes to be true and which constitutes the best information reasonably available to a petitioner." *Id*. at 4. "Thus, the Department does not automatically terminate an investigation simply because, as the investigation developed, information was placed on the record which was found to be inconsistent with some of the information in the petition." *Id*.[6]

In light of that framework, Commerce cast its inquiry on remand as "whether the petitioners acted reasonably and without reckless disregard of the truth when they alleged that Tung Fong had home market sales." *Id*. at 4.[7] Commerce sought and obtained a complete copy of the foreign

---

For example, if Commerce finds that a petitioner acted with reckless disregard for the truth, but the false information is not *essential* to the sufficiency of the petition, it is not clear why termination of the investigation would necessarily be the appropriate sanction. (This would be particularly true if the guilty party were the petitioner's consultant/researcher, and the petitioner itself had no knowledge of the falsity of the information.) By the same token, if Commerce determines that information *essential* to the sufficiency of a petition is false, the basis for continuing the investigation is not clear – without regard to the *mens rea* of the petitioner (or its research associates). *See* n.20, *infra*. Certainly Gilmore gives no indication that a petitioner's *mens rea* is relevant, much less determinative. Gilmore, 7 CIT 219, 585 F. Supp. 670.

[6]The Remand Results string-cite authorities for this proposition. *See* Remand Results at 4 n.1. However, none of the investigations on which Commerce relies parallels this case. Specifically, unlike the information at issue in the case at bar, the "inconsistent" information in those cases was not *essential* to the sufficiency of the petitions.

[7]As discussed in greater detail elsewhere in this opinion, Commerce's characterization of the issue on remand in its Remand Results differs in certain significant respects from the actual remand instructions in Tung Fong I.

In a nutshell, while the Remand Results focus largely on the issue of *mens rea*, the actual remand instructions in Tung Fong I focused on the implications (vis-a-vis continuation of the investigation) of a petition's false allegations of home market sales, without regard to the *mens rea* of the petitioners (or, more specifically, their foreign market research consultant). *See* Defendant's

market research report on which the petition here was based. *Id*. at 5. Based on its review of the

report and the petition, Commerce found that "the information presented in the petition is consistent

with the foreign market research report." *Id*. at 5. Moreover, based on its review of the report and

---

Response to the Domestic Industry's Amended Motion to Intervene at 2-3 (noting that, although Tung Fong I referred in passing to *mens rea*, "in the portion of the decision granting . . . Tung Fong's motion for judgment upon the agency record, the Court only asked Commerce to consider the 'falsity' of the domestic manufacturers' allegations of home market sales").

       Subsequently, more than three years after the commencement of this action – and, indeed, a full four months after the issuance of Tung Fong I – the domestic manufacturers sought to intervene to address the issue of the sufficiency of the petition (and, in particular, whether the petition's allegations of home market sales were made with reckless disregard for the truth). *See* Domestic Industry's Partial Consent Motion to Intervene; The Domestic Industry's Amended Partial Consent Motion to Intervene ("Motion to Intervene").

       As the Government notes, however, Rule 24(a) of the Rules of the Court requires that such a motion be filed no later than 30 days after service of the complaint, absent good cause for delay. *See* Defendant's Response to the Domestic Industry's Amended Motion to Intervene at 1. And, although the Motion to Intervene asserts that the domestic manufacturers were "surprised" by the concerns about the sufficiency of the petition expressed in Tung Fong I, the issue of the asserted falsity of the allegation of home market sales was raised in this action from its inception, beginning with Tung Fong's complaint and through the briefing on its motion for judgment on the agency record. *See* Letter from the Court to Counsel for Domestic Industry ¶ 1(Aug. 11, 2004); Complaint at Claim II (reiterating Tung Fong's challenge to "[t]he Department's *initiation* of the dumping investigation") (emphasis added); Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Agency Record at 1-4; Plaintiff's Reply to Opposition Memorandum at 2-3.

       Moreover, even assuming *arguendo* that the intervention "clock" began to run only upon issuance of Tung Fong I, the domestic manufacturers have failed to justify their delay thereafter. *Compare* Letter from the Court to Counsel for Domestic Industry ¶ 3 (Aug. 11, 2004) *with* Motion to Intervene. The Motion to Intervene therefore must be denied.

       The discussion of the Remand Results herein nevertheless effectively moots the domestic manufacturers' request that the record in this matter be clarified to reflect that – on remand – "Commerce did *not* find that the domestic manufacturers . . . acted with reckless disregard for the truth." *See* Letter from Counsel for Domestic Industry to the Court (Nov. 18, 2004); Defendant's Response to the Domestic Manufacturers' Unauthorized Letter Seeking An Order Clarifying the Record at 2.

the record as a whole, Commerce found that "there is insufficient evidence to conclude that the

petition was unsupported." *Id*. at 5.[8]  Indeed, Commerce went even further, finding "no conclusive

evidence that the parties acted with reckless disregard for the truth." *Id*. at 5.

The Remand Results note that the petition here alleged that Tung Fong had a viable home

market of a specified volume of sales in calendar year 1998.  Tung Fong sought to refute that

allegation, emphasizing that its registration with the Philippine government's Economic Zone

Authority ("EZA") as an export producer of pipe fittings precludes it from making sales in its home

---

[8]The Remand Results state that – in reaching this conclusion – Commerce considered both "the overall integrity of the foreign market research report which formed the basis of the petition, and the sufficiency of the allegation of home market sales contained therein."  Remand Results at 5.

In evaluating "the overall integrity of the foreign market research report," Commerce noted that "information sources are fully identified" in the report, that the report included "no obvious inconsistencies or contradictions," that the researcher used "standard acceptable research procedures," and that the researcher "certified to the accuracy of the information."  On those grounds, Commerce found the foreign market research report "adequate on its face."  *Id*.

It is worth noting that Commerce is now considering amendments to its regulations, to clarify and strengthen the requirements governing the certification of factual information submitted in the course of antidumping and countervailing duty proceedings.  The proposed amendments, *inter alia*, emphasize that certifications continue in force throughout a proceeding (so that "if the certifying person possesses knowledge or has reason to know of a material misrepresentation or omission of fact in the submission or in any previously certified information upon which the submission relies, that person must report such to the Department").  In addition, the proposed amendments emphasize that criminal sanctions may be imposed for making false statements.  *See* Notice of Proposed Rulemaking and Request for Comments: Certification of Factual Information to Import Administration During Antidumping and Countervailing Duty Proceedings, 69 Fed. Reg. 56,738 (Sept. 22, 2004).

market, absent a waiver from EZA officials.[9]  And, according to documentation submitted by Tung

Fong, the company's last waiver expired in mid-1998.  *See* Remand Results at 6.[10]

However, the Remand Results note that – even if true[11] –  the information that Tung Fong

supplied does not necessarily mean that the information in the petition was false.  As Commerce

explains, it is at least possible to reconcile the two positions.  The home market data in the petition

was assertedly drawn from Tung Fong's financial reports for calendar year 1998.[12]  However, the

---

[9]As Tung Fong I explained, Tung Fong's status as an export producer operating within a Philippine Economic Zone permits the company to purchase raw materials duty-free, provided that its products are manufactured for export only.  Tung Fong I, 28 CIT at ____, 318 F. Supp. 2d at 1326.

[10]In addition to emphasizing that it had no authority to sell in its home market after mid-1998, Tung Fong also asserts that Commerce verified that the company had no home market sales during the period of investigation.  *See* Remand Results at 7.  The Remand Results deem the record on this point to be "inconclusive."  Remand Results at 9.

Specifically, Commerce states that – because the agency assertedly was not focused at the time on whether Tung Fong in fact had any home market sales – the Verification Report does not address that issue.  Commerce further notes that, because the sales volumes alleged were "very small," they "could easily have been missed by a verifier when examining company documents." More to the point, however, as discussed in greater detail below, Commerce now believes that the sales *price* information in the petition was actually based on *offers for sale*, rather than *actual sales*; and, obviously, if Tung Fong had no actual sales, there  would have been no sales documentation or related entries in the company's record books for Commerce verification personnel to review. According to the Remand Results, "[a]ll of these factors demonstrate that the Department did not verify the discrete issue of whether Tung Fong had *any* home market sales."  *See* Remand Results at 9.

[11]Although Commerce hedges with the phrase "even if true," the Remand Results point to no evidence to impeach Tung Fong's statements.

[12]According to the Remand Results, that information would have been the most recent data available to petitioners.  Remand Results at 6.

relevant period of investigation did not begin until October 1998. Because Tung Fong's waiver did not expire until mid-1998, the company could have made sales in its home market up to that time.[13] Any such sales would have been reflected in the calendar year 1998 data on which the petition relied; but the sales would have pre-dated October 1998, and thus would have been outside the period of investigation (as Tung Fong has consistently maintained). *See* Remand Results at 6. The Remand Results further emphasize – albeit somewhat defensively – that there is "nothing on the record" to indicate that information about waivers (including their dates of expiration) is publicly available, or that petitioners or their market researcher were ever informed that Tung Fong's waiver expired in mid-1998.[14] The Remand Results therefore find that "it was reasonable for petitioners to conclude that Tung Fong had a viable home market based upon the data available to them at the time." Remand Results at 6-7.

As to the specific home market selling *prices* on which petitioners based their dumping allegations, the Remand Results surmise that the price information in the petition reflects not *actual sales* (as the foreign market research report stated),[15] but – instead – *offers for sale*.[16] *See* Remand

---

[13]The Remand Results note pointedly that "Tung Fong has never stated that it did not sell in the home market until that time." Remand Results at 6.

[14]Of course, it is also true that Commerce apparently never asked Tung Fong to reconcile its insistence that it had no home market sales in the period of investigation with the allegations in the petition.

[15]The Remand Results concede that the foreign market research report referred to "actual sales," not "offers for sale." However, Commerce now asserts that the issue was clarified when agency officials interviewed the petitioners' foreign market researcher in January 2000. *See* Remand Results at 8.

[16]Commerce seeks to make much of the fact that, while Tung Fong has consistently and repeatedly denied making any home market sales during the period of investigation, the company

Results at 7-8. Noting that Commerce has on a number of occasions initiated investigations where

the normal value in the petition was based on offers for sale (rather than actual sales),[17] the Remand

Results conclude that – even if Tung Fong had no home market sales during the period of

investigation (as the company has consistently maintained) – that fact alone does not necessarily

mean that there was "no factual basis for the selling prices reported in the petition." Remand Results

at 8-9.[18]

_____

"has not denied that it made offers for sale." Remand Results at 7. However, Commerce points to nothing that suggests that Tung Fong was ever even asked about such offers. *See* Remand Results at 7-8 (apparently without ever having asked the obvious question, Commerce extrapolates from information which Tung Fong supplied in order to refute allegations of *actual home market sales*, to conclude that Tung Fong could have made *offers* for such sales).

[17]*See* Remand Results at 8 n.5 (*citing* Notice of Initiation of Antidumping Duty Investigations: Certain Color Television Receivers From Malaysia and the People's Republic of China, 68 Fed. Reg. 32,013 (May 29, 2003); Notice of Initiation of Antidumping Duty Investigations: Oil Country Tubular Goods From Austria, Brazil, the People's Republic of China, France, Germany, India, Indonesia, Romania, South Africa, Spain, Turkey, Ukraine and Venezuela, 67 Fed. Reg. 20,730 (April 26, 2002); Notice of Initiation of Antidumping Duty Investigations: Stainless Steel Bar From France, Germany, Italy, Korea, Taiwan, and Ukraine, 66 Fed. Reg. 7620 (Jan. 24, 2001)).

[18]Because Tung Fong's waiver authorizing it to make home market sales expired in mid-1998 (before the period of investigation), Commerce's analysis on this point necessarily proceeds on the assumption that, had one of Tung Fong's alleged "offers for sale" been accepted, either (a) the company would have sought, and received, the necessary waiver from EZA officials, or (b) the company would have made the sale in violation of the law.

However, as Commerce itself concedes, the record is devoid of information to support its first assumption (*i.e.*, that Tung Fong could and would have received a waiver). *See* Remand Results at 7 (noting that "[t]he record contains no information about the process for obtaining a waiver to sell in the home market, nor the effect of such a waiver (*e.g.*, when it could become effective).").

Nor is there any record evidence to support Commerce's implication that Tung Fong would have flouted the law by making home market sales without obtaining the requisite waiver. On this point, the Remand Results note only that Commerce reviewed Philippine law, which is said to

For all the above reasons, Commerce satisfied itself on remand that "there is an insufficient basis for Tung Fong's argument that the investigation should [have been] terminated because it had no home market sales." Remand Results at 10. Commerce argues that its conclusion "is further supported when [one] consider[s] the broader context of the investigation, one in which Tung Fong was not the only respondent." *Id*.

In particular, Commerce emphasizes in the Remand Results that, in addition to Tung Fong, the investigation included another Philippine respondent – Enlin Steel Corporation ("Enlin"). Thus, because Enlin was also a subject of the agency's investigation, and because "[Commerce's] practice is always to conduct antidumping investigations on a country-wide basis," Commerce would not have terminated its investigation even if it had concluded at the time that Tung Fong had no home market sales during the period of investigation (at least "absent a showing that Enlin too had no home market sales, and [a showing that] the petitioner, in alleging the existence of such sales acted in reckless disregard for the truth"). *See* Remand Results at 10-12.[19]

---

"show[ ] that the effect of selling without a waiver is only that additional taxes must be paid, and not that any criminal sanctions would ensue." *See* Remand Results at 8 (citations omitted). In any event, even if Commerce's legal analysis is accurate as far as it goes, it nevertheless fails to address the impact of illegal home market sales on a company's continued authority to operate within a special Economic Zone in the future.

[19]As Commerce observes in the Remand Results, Enlin – like Tung Fong – attested in its initial questionnaire responses that it too had no home market sales during the period of investigation. However, because Enlin thereafter ceased responding to the agency's requests for information, "the record contains far less information on the issue of home market sales for Enlin." Commerce therefore "does not know what it would have found had Enlin continued to participate in the investigation." *See* Remand Results at 10-11.

In sum, Commerce concluded on remand that – although the information available to it concerning the bases for the representations in the foreign market research report is "limited" – "the information to which Tung Fong points to demonstrate that it had no home market sales is not so conclusive" as to prove that the representations in the report were false or "that the information in the petition was unsupported." Moreover, Commerce found that "nothing from the record substantiates Enlin's claim that it had no home market sales" during the period of investigation. Accordingly, Commerce concluded on remand that "it was appropriate to complete the investigation." *See* Remand Results at 12.

Tung Fong has advised that it has reviewed the additional information compiled by Commerce on remand, and "is now satisfied as to the sufficiency of the petition." *See* Plaintiff's Comments at 1. It is therefore unnecessary to give further consideration here to the legal merits of Commerce's position that it is appropriate to terminate an investigation only if it is established that a petitioner "acted in reckless disregard for the truth." *See*, *e.g.*, Remand Results at 3 (stating that Commerce will terminate an investigation if it finds "that a petitioner has acted with *reckless disregard for the truth*") (emphasis added), 11-12 (stating that Commerce would have terminated the instant investigation only if "Enlin too had no home market sales, and the petitioner . . . acted in *reckless disregard for the truth*") (emphasis added).

It is enough, for these purposes, to note that – notwithstanding Commerce's characterization of the issue – Tung Fong I remanded this matter not to allow Commerce to determine the *mens rea* of the petitioners' market researcher but, rather, to allow the agency "to reconsider the adequacy of the . . . petition," and the consequences of the apparent falsity of the allegations of home market sales

by Tung Fong. *Compare* Tung Fong I, 28 CIT at ____, ____, 318 F. Supp. 2d at 1323, 1338 *with* Remand Results at 4 (stating that Commerce's "point of inquiry" on remand "is whether the petitioners acted reasonably and without reckless disregard of the truth when they alleged that Tung Fong had home market sales"). While Commerce seems to treat *mens rea* as central to the issue of the sufficiency of a petition and the termination of an investigation, the rationale for that position remains unclear. *See generally* Gilmore, 7 CIT 219, 585 F. Supp. 670.[20]

---

[20]As note 5 above suggests, it would seem that – where a petition includes allegations found to have been made in reckless disregard of the truth – the agency should impose some appropriate sanction on the guilty party. However, unless the false allegations implicate the fundamental sufficiency of the petition, it would not seem appropriate to terminate the investigation, no matter how culpable the party.

On the other hand, if it is established – particularly at the earliest stages of an investigation – that allegations *essential* to the fundamental sufficiency of a petition are false (*i.e.*, that but for those allegations, the agency would have found the petition insufficient and no investigation would have been initiated), there is a strong case that the investigation should be terminated, whether or not the allegations were made in reckless disregard of the truth. *See generally* Gilmore, 7 CIT 219, 585 F. Supp. 670.

Where – as in this case – the allegations in question are absolutely essential to the sufficiency of the petition, the situation is quite different from the garden-variety case where, in the course of an investigation, "information [is] placed on the record which [is] found to be inconsistent with some of the information in the petition." *See* Remand Results at 4.

Commerce's reliance on 19 U.S.C. § 1673a(b)(1) as authority for its position is strained. *See* Remand Results at 4. On its face, that statute requires only that an investigation be *commenced* under the specified circumstances. Nothing in the statute precludes Commerce from *terminating* an investigation where the agency later determines that information essential to the fundamental sufficiency of the petition is false. *See* Gilmore, 7 CIT at 223, 670 F. Supp. at 674 (rejecting argument that statutory provision governing *initiation* of an investigation precludes subsequent *termination* of that investigation).

### B.  Commerce's Use of "Adverse Facts Available"

As discussed in <u>Tung Fong I</u>, Tung Fong has also argued in this action that – even if the investigation was proper – Commerce erred by using partial "adverse facts available" to calculate the company's dumping margin.[21]  Specifically, Tung Fong challenged Commerce's determination that the company "failed to cooperate by not acting to the best of its ability" in responding to the agency's requests for information.  *See* <u>Tung Fong I</u>, 28 CIT at _____, 318 F. Supp. 2d at 1333-37 (citations omitted).

<u>Tung Fong I</u> reviewed Commerce's various proffered justifications for resorting to "adverse facts available" and found them wanting.  Among other things, "Commerce . . . made no findings on the extent of Tung Fong's resources (or lack thereof), and pointed to no evidence to support its conclusory assertion that – notwithstanding Tung Fong's limited resources – the company could have responded to the agency's requests for information in a more timely fashion."  <u>Tung Fong I</u>, 28 CIT at _____, 318 F. Supp. 2d at 1337.  The matter was therefore remanded to Commerce, "to allow the Department to reconsider its decision to resort to adverse facts available . . . (and, if appropriate, to reevaluate the particular adverse facts selected)."  <u>Tung Fong I</u>, 28 CIT at _____, _____, 318 F. Supp. 2d at 1323, 1338.

---

[21]In the course of its investigation, Commerce calculated a sale-by-sale margin only for those U.S. sales which had a match to an identical model in the third-country market.  To all other U.S. sales (*i.e.*, those U.S. sales matching to similar merchandise), the agency applied the highest margin found for any U.S. sale for which it did find an identical match.  *See* Remand Results at 16.

On remand, Commerce recalculated Tung Fong's antidumping margin, using the cost data submitted by the company in lieu of adverse facts available.[22]  *See* Remand Results at 1, 17.  As revised, Tung Fong's weighted-average margin for the period of investigation is 7.59%.  *See* Remand Results at 19.  Tung Fong has advised that it is now "satisfied with the Department's remand decision, and has no further objections."  Plaintiff's Comments at 1.

Because the Remand Results on this issue comply with Tung Fong I, and in the absence of any objection, they are sustained.

---

[22]In its Remand Results, Commerce states that its first Draft Results of Redetermination on remand applied neutral facts available to Tung Fong's U.S. sales for which there was no match of an identical sale in the third-country market.  However, according to the Remand Results, after that first draft issued, Commerce re-reviewed Tung Fong I and decided that it ruled "that the use of adverse facts available was improper under the facts of this case."  *See* Remand Results at 17, 19.

To the contrary, although Tung Fong I found that Commerce had failed to articulate an adequate rationale for its resort to adverse facts available or to support that decision by reference to the administrative record, it did not preclude the agency from continuing to use adverse facts available – assuming that, on remand, it articulated an adequate rationale with appropriate support (whether in the existing record, or in the record as supplemented).

Indeed, the language of the remand instructions in Tung Fong I expressly contemplated that Commerce might continue to use adverse facts available.  Specifically, the issue was remanded "to allow the Department to reconsider its decision to resort to adverse facts available . . . (*and, if appropriate, to reevaluate the particular adverse facts selected*)."  Tung Fong I, 28 CIT at _____, _____, 318 F. Supp. 2d at 1323, 1338 (emphasis added).  If – notwithstanding that language, which appeared in two places in the opinion – Commerce nevertheless had doubts about the meaning of Tung Fong I or the agency's latitude on remand, it could have sought clarification from the Court.  It never did so.

## II. **Conclusion**

For the reasons set forth above, the Final Results of Redetermination Pursuant to Court Remand in this action are sustained.  Judgment will enter accordingly.



/s/

Delissa A. Ridgway
Judge

Decided:   March 23, 2005
               New York, New York